SAUDI BASIC INDUSTRIES
CORPORATION, Plaintiff
Below, Appellant,

v.

MOBIL YANBU PETROCHEMICAL
COMPANY, INC. and EXXON
CHEMICAL ARABIA, INC., Defen-
dants Below, Appellees.

No. 493,2003.

Supreme Court of Delaware.

Submitted: June 1, 2004.
Decided: Jan. 14, 2005.
Reargument Denied Feb. 22, 2005.

See also 364 F.3d 102.

A. Gilchrist Sparks (argued), Donald E. Reid and Jason A. Cincilla, Esquires, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Of Counsel: Kenneth R. Adamo, Joseph L. McEntee, Jr. and Margaret I. Lyle, Esquires, of Jones Day, Dallas, Texas; Gregory A. Castanias, Lawrence D. Rosenberg, Elizabeth Rees and William K. Shirey II, Esquires, of Jones Day, Washington, D.C.; for Appellant.

William J. Wade, Esquire, of Richards, Layton & Finger, Wilmington, Delaware; Of Counsel: James W. Quinn (argued), David Lender and Gregory S. Coleman, Esquires, of Weil, Gotshal & Manges LLP, New York, New York; Andrew S. Pollis and David J. Michalski, Esquires, of Hahn Loeser & Parks LLP, Cleveland, Ohio; Elizabeth J. Sher, Esquire, of Pitney Hardin LLP, Florham Park, New Jersey; Kenneth C. Johnson, Esquire of Exxon Mobil Corporation, Houston, Texas; for Appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER and JACOBS, Justices, and STRINE, Vice Chancellor,[1] constituting the Court en Banc.

JACOBS, Justice.

Saudi Basic Industries Corporation ("SABIC"), the counterclaim defendant below, appeals from a $416.8 million Superior Court judgment entered against SABIC and in favor of SABIC's joint venture partners, Mobil Yanbu Petroleum Company ("Mobil") and Exxon Chemical Arabia, Inc. ("Exxon").[2] SABIC brought this action in the Superior Court of Delaware, seeking a declaratory judgment that any payments made to SABIC by the joint venture partnerships were not overcharges that violated any applicable contract. In response, Mobil and Exxon asserted counterclaims in

---

1. Sitting by designation pursuant to Art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 and 4.

2. Except where the context otherwise requires, Mobil and Exxon, the two counterclaim plaintiffs below, are referred to collectively as "ExxonMobil." Although Exxon's and Mobil's respective parents merged in 1999 to form ExxonMobil, they were separate companies and competitors at the time that most of the critical events in this lawsuit took place.

tort[3] and for breach of contract, alleging that for over two decades, SABIC had secretly overcharged the partnerships for technology that SABIC had licensed from Union Carbide Corporation. After a two-week trial, the jury found that SABIC had breached the joint venture agreements and had also committed the Saudi tort of usurpation against both Mobil and Exxon. Based on those findings, the jury awarded compensatory damages of $220,238,108 to Mobil and $196,642,656 to Exxon.

On this appeal, SABIC contends that the judgment should be reversed and/or that the case should be remanded for a new trial, because the trial judge made numerous rulings, both substantive and evidentiary, that were erroneous as a matter of law. Having considered in depth the parties' briefs and the extensive record, we conclude that none of SABIC's multitudinous claims of error has merit and that the judgment of the Superior Court should be affirmed.

## FACTS

The facts that are pertinent to this appeal are either undisputed or, where disputed, are based upon reasonable inferences from the record evidence that, viewed in the light most favorable to the prevailing parties, raise issues of material fact that the jury could justifiably have resolved in ExxonMobil's favor.[4]

### 1. Formation of the Joint Venture Partnerships

SABIC is a Saudi Arabian corporation that originally was 100% owned (and now is 70% owned) by the Saudi government. SABIC was formed in the late 1970s to work jointly with several firms to use petroleum-based feedstocks in manufacturing polyethelene, which is a type of plastic. During the mid-to-late 1970s, in order to diversify Saudi Arabia's industrial base, SABIC began exploring the possibility of forming joint ventures to manufacture polyethylene. The result was the formation of two separate 50–50 joint ventures, one between SABIC and Mobil (the "Yanpet joint venture"), and the other between SABIC and Exxon (the "Kemya joint venture"). The Yanpet joint venture was formed by an agreement SABIC and Mobil entered into on April 19, 1980; the agreement for the Kemya joint venture was entered into between SABIC and Exxon on April 26, 1980. Both joint ventures had the same ultimate purpose: to manufacture polyethelene in Saudi Arabia.

A critical, carefully negotiated premise of both joint ventures was that the profits enjoyed by each joint venture partner would be limited to the profits earned by the joint venture. As a result, no partner would profit at the joint venture's expense. Consistent with that principle, the joint venture agreements forbade any partner

3. As discussed more fully herein, ExxonMobil's tort claim was based upon the Saudi Arabian tort of *ghasb* (usurpation).

4. The facts recited in this Opinion are shaped by the applicable standard of review. SABIC claims on appeal, among other things, that the trial court erroneously denied SABIC's motion for judgment as a matter of law. This Court reviews the denial of such a motion to determine " 'whether the evidence and all reasonable inferences that can be drawn therefrom, taken in a light most favorable to the non-moving party, raise an issue of material fact for consideration by the jury.' In other words, we will not disturb a Superior Court ruling denying a motion for judgment as a matter of law where 'under any reasonable view of the evidence the jury could have justifiably found for [the non-moving party].' " *Mazda Motor Corp. v. Lindahl*, 706 A.2d 526, 530 (Del.1998) (internal citations omitted); accord, *Chrysler Corp. (Del.) v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1036 (Del.2003).

from charging a "mark-up" on technology procured from a third party and sublicensed to the joint venture. Thus, Article 6.3 of the Yanpet joint venture agreement provided:

> To the extent either Partner or any Affiliate thereof procures patents, processes and other licensing rights of third parties, and sublicenses such rights to the partnership, it shall not receive any remuneration other than actual cost incurred in acquiring and sublicensing such right.

And, Article 6.3 of the Kemya joint venture agreement, which was to the same effect, provided that:

> Patents, processes, and other licensing rights of third parties which require the payment of royalties, rentals and other remuneration to such third parties shall be paid by the Partnership against appropriate invoices. To the extent either Partner or any Affiliate thereof procure such rights and sublicenses for the Partnership, it shall not receive any remuneration other than actual cost disbursed in acquiring such license.

## 2. SABIC Secretly Overcharges The Yanpet And Kemya Joint Ventures

In order to manufacture polyethylene, Yanpet (the SABIC/Mobil joint venture partnership) needed technology that it did not own. Initially, the parties intended that Yanpet would license Unipol® PE technology directly from Union Carbide Corporation ("UCC"). After a Spring 1980 meeting in Riyadh, Saudi Arabia, however, SABIC informed its partner, Mobil, that SABIC itself would license the technology directly from UCC and then sublicense it to Yanpet. Consistent with Article 6.3, SABIC assured Mobil that SA-

BIC would pass through to Yanpet at its cost, "dollar for dollar," the amounts SABIC paid to UCC for Yanpet's use of the Unipol® PE technology. In fact, however, SABIC intended to furnish the technology to Yanpet at a mark-up above SABIC's cost.

In September 1980, SABIC and UCC executed an agreement granting SABIC an exclusive license to the Unipol® PE technology within the Kingdom of Saudi Arabia (the "SABIC/UCC License Agreement"). Neither Mobil nor Yanpet was permitted to attend any of the meetings between SABIC and UCC at which the financial terms of the SABIC/UCC License Agreement were discussed. That did not concern Mobil, because having been assured that SABIC would be providing Yanpet the same terms that SABIC itself had procured from UCC, Mobil and Yanpet did not negotiate, or even comment upon, the financial terms of the sublicense. Ultimately, SABIC and Yanpet executed the SABIC–Yanpet Unipol® PE Technology License Agreement, which was dated effective October 15, 1980.

Over the following two decades, SABIC charged Yanpet sublicense fees and royalties that were substantially higher than what SABIC was paying to UCC under the SABIC/UCC License Agreement.[5] Because SABIC never told Mobil that it had marked up the sublicense fees and royalties, Mobil believed, during that entire time, that SABIC's license royalties were being passed through to Yanpet at cost.

The negotiation of and performance under the sublicense agreement between SABIC and Kemya (the SABIC–Exxon joint venture partnership) mirrored the Mo-

---

**5.** There is evidence that SABIC's motive for the surreptitious overcharges was to create a "cushion" for itself in case the joint ventures failed. SABIC accounted for the mark-up in its own internal accounting documents as its "profit" or "net gain."

bil/Yanpet fact pattern. Originally, SABIC and Exxon planned for Kemya to use Exxon's own proprietary technology to manufacture polyethylene. Later, they understood that instead, Exxon would acquire the right to use UCC's Unipol® PE technology, and would then grant a Unipol® PE license to Kemya, as sublicensee. Ultimately, however, as with Yanpet, SABIC informed Exxon, in a March 1980 meeting in Riyadh, that it (SABIC) would license that technology directly from UCC, and then sublicense the technology to Kemya. Like Mobil, Exxon was excluded from the negotiations over the financial terms of the SABIC/UCC license. That did not concern Exxon because Mr. Ibrahim Bin Salamah, SABIC's chief negotiator for the Kemya and Yanpet Joint Venture Agreements and also for the Kemya and Yanpet Unipol® PE/UCC technology sublicenses, assured Exxon's representative that SABIC was "not interested in profiting on the technology passed on to its [joint ventures]."

In fact, however, SABIC never intended to limit its royalty charges to Kemya to the amount(s) that SABIC would be paying to UCC. As with Yanpet, SABIC had determined to charge a marked-up royalty to Kemya. Following the same pattern that it employed with Yanpet, SABIC overcharged Kemya for its use of the Unipol® PE technology, to create a "cushion" in case the ventures failed. SABIC accounted for the overcharges as a "profit" in its internal financial records.

In June 1987, because of poor market conditions in the polyethylene business, UCC agreed to reduce the royalties due from its licensees, including SABIC. Correspondingly, the joint venture partners amended the Yanpet and Kemya sublicenses to reduce the royalties payable by the joint venture partnerships to SABIC. Unbeknownst to ExxonMobil, however, SABIC had negotiated for itself a royalty rate reduction that was significantly larger than the reduction SABIC had granted to the joint ventures. Exxon and Mobil representatives testified that SABIC never told Mobil, Yanpet, Exxon or Kemya that it had extracted a reduction in the cost of Unipol® PE technology that was much larger than the reduction SABIC had extended to Yanpet and Kemya. SABIC's concealment of the discrepancy between those royalty reductions—which had the effect of increasing SABIC's reserves—was intentional.

Not until the year 2000 did ExxonMobil discover the overcharge. That occurred as a result of a dispute between SABIC and the Saudi taxing authority relating to the royalties paid by SABIC to UCC under the SABIC/UCC Agreement. The Saudi taxing authority determined that those payments were taxable. That decision prompted SABIC to send letters to Kemya and Yanpet informing them of the tax dispute and demanding that the partnerships pay a share of the tax to SABIC. While attempting to determine the accuracy of SABIC's indemnification demand, ExxonMobil discovered, for the first time,[6]

---

6. In support of its argument that ExxonMobil had waived their overcharge claims and that, in any event, the claims were barred by the statute of limitations, SABIC points to testimony of Richard Todd, a Kemya secondee, speculating about a possible difference between the amounts paid by Kemya and amounts paid by SABIC. Todd conceded, however, that he had no actual evidence of any differential, that he did not know whether

there was, in fact, any difference, and that he was unaware of any assurances by SABIC to Exxon and Kemya that there would be no mark-up.

In an effort to establish its defense of waiver or, alternatively, that ExxonMobil had been on inquiry notice of its claims for statute of limitations purposes, SABIC also cites two June 1994 form letters, sent separately by

that SABIC had overcharged the partnerships for furnishing the UCC's Unipol® PE technology.

### 3. The Procedural History Of The Litigation

To aid an understanding of the issues presented by SABIC's arguments, it is helpful first to summarize the procedural history of the litigation, including the trial court rulings that are challenged on this appeal.

#### a. *The New Jersey Federal Action*

The claims at issue first surfaced in litigation brought by SABIC against ExxonMobil in the United States District Court for the District of New Jersey. In that court, SABIC sought a declaratory judgment that ExxonMobil had used technology, previously developed for Kemya, to obtain proprietary information (including patent and trade secrets) in violation of ExxonMobil's service agreement with Kemya. SABIC sought a declaratory judgment that Kemya owned the patents, and also sought an injunction directing ExxonMobil to transfer legal title to those patents to Kemya.[7]

ExxonMobil raised the defense of unclean hands against SABIC's claim, contending that SABIC had wrongfully overcharged Kemya for the royalty payments at issue here.[8] During the discovery stage, SABIC agreed to a consent order that would have required SABIC to respond to discovery regarding the overcharge claims. But SABIC did not comply with that order. Instead, it filed the Delaware Superior Court action that is the subject of this appeal.[9]

#### b. *The Delaware Superior Court Action*

In its Superior Court action, SABIC sought a declaratory judgment that Kemya's and Yanpet's royalty payments to SABIC were not overcharges that violated any applicable contract. In response, ExxonMobil interposed counterclaims for damages, based upon SABIC's alleged breaches of the joint venture agreements, breaches of fiduciary duty and upon the implied duty of good faith, and the doctrines of unjust enrichment and promissory estoppel. ExxonMobil also demanded a jury trial, to which SABIC made no objection until only weeks before the trial, when SABIC moved (unsuccessfully) to strike the jury trial demand.

---

SABIC to Yanpet and Kemya, that inadvertently attached a June 10, 1994 statement from UCC to SABIC. There is no evidence that anyone at Mobil ever saw that document or that anyone at Yanpet ever told Mobil about it. Nor did Kemya know what the document meant, because the UCC document addressed several joint ventures and the numbers relating to each were different. When Kemya asked SABIC about the document, SABIC reassured Kemya that the sublicense was a pass-through and that there were no overcharges. As a result of, and in reliance upon, that representation, Exxon and Kemya made no further inquiry about this issue.

7. *Saudi Basic Indus. Corp. v. ExxonMobil Corp.*, 194 F.Supp.2d 378, 384 (D.N.J.2002), *vacated in part and remanded in part*, 364 F.3d

102 (3rd Cir.2004), *cert. granted*, —— U.S. ——, 125 S.Ct. 310, 160 L.Ed.2d 221 (2004).

8. *Id.* Shortly after SABIC filed the Superior Court action, ExxonMobil filed a separate action against SABIC in the New Jersey federal court to recover the royalty overcharges. SABIC moved to dismiss that second action, claiming that, as a "foreign state," it was immunized from being sued in the United States under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et. seq. ("FSIA"). The New Jersey District Court held that by filing suit in New Jersey, SABIC had waived any FSIA immunity as to the overcharge claims. *See* 194 F.Supp.2d at 401, 403.

9. *Id.*, 194 F.Supp.2d at 413–414, n. 15.

On March 21, 2003, at the conclusion of a two week trial, the jury returned a verdict awarding compensatory damages of $220,238,108 to Mobil and $196,642,656 to Exxon. The jury found that SABIC had breached Article 6.3 of both the Yanpet and Kemya joint venture agreements, and also that SABIC had committed the Saudi tort of usurpation (*"ghasb "*) against both Mobil and Exxon.

SABIC claims on this appeal that that jury verdict must be set aside because it was the product of multitudinous rulings, all erroneous as a matter of law, made by the trial judge during the course of the Superior Court action. The rulings that are contested on this appeal fall into five separate groupings. To better understand SABIC's claims on appeal, and our analysis of those claims, the contested rulings are briefly summarized at this point.

(1) *The Statute of Limitations Rulings*

Before trial, SABIC moved for summary judgment on the ground that ExxonMobil's claims were barred by Delaware's three-year statute of limitations. The trial court denied that motion, holding as a matter of law that (1) under substantive principles of Saudi law (which both sides agree is applicable), ExxonMobil's claims were property rights that could not be barred by the passage of time; and (2) Delaware's borrowing statute (which would have subjected ExxonMobil's claims to the three year limitations period) was inapplicable.[10] The trial court later denied SABIC's post-trial motion for judgment as a matter of law or, alternatively, for a new trial, holding that the court had previously determined, as a matter of law, that the Delaware three-

year statute of limitations did not bar ExxonMobil's claims.[11]

(2) *The Evidentiary Rulings*

Both before and during the trial, the Superior Court made evidentiary rulings. Four of those rulings are contested on this appeal and are next described.

(a) the exclusion of certain testimony by Ibrahim Bin Salamah—proffered by SABIC long after the discovery cutoff date and shortly before trial—that contradicted the prior testimony of Bin Salamah and of another SABIC witness, as well as SABIC's formal admissions that SABIC intended to charge a marked-up royalty to Yanpet and Kemya but never disclosed that intent to its partners;

(b) the admission of an internal memorandum authored by Exxon employee, John Webb, reflecting representations by Mr. Bin Salamah in 1986, that the royalty rates paid by SABIC to UCC for its Unipol® PE license were the same as the royalty rates being paid by ExxonMobil as sublicensees of SABIC;

(c) the admission of testimony of Exxon employee George Fitzpatrick, and of Mobil employee Robert Murphy, that SABIC had promised ExxonMobil a "pass through" license, and later represented that it (SABIC) had "passed through" its billings to Kemya and Yanpet at SABIC's cost; and

(d) the limitation of the scope of evidence (proffered by SABIC) of Exxon's subjective intent relating to drafts of agreements that predated the joint venture, and that were never executed, in connection with ExxonMobil's possibly providing polyethene technology to the

10. Bench Ruling, C.A. No. 000–07–161, Feb. 10, 2003 (Appellant's Opening Br. at R4–8).

11. *Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochemical Co. et al.,* C.A. No. 000–07–161, 2003 WL 22016813 (Del.Super.Aug.26, 2003).

joint ventures.[12]

### (3) *The Rulings On SABIC's Defense of Release*

One of SABIC's defenses to ExxonMobil's counterclaims was that the 1987 Letter Agreements, wherein ExxonMobil and SABIC renegotiated the joint ventures license fees, operated to release all payment-related claims that ExxonMobil could have brought against SABIC. The trial court granted judgment as a matter of law to ExxonMobil on that release defense on three separate grounds: (i) neither Exxon nor Mobil had signed the 1987 Letter Agreements; (ii) the unambiguous language of those Agreements limited the scope of any release to technology-related claims and did not include payment-related claims; and (iii) the only evidence as to the relevant Saudi law was the unrebutted testimony of Professor Wael B. Hallaq, who opined that the 1987 Letter Agreements would not affect ExxonMobil's claims as a matter of law. After the jury verdict, SABIC renewed its motion for judgment as a matter of law, based on the same release defense that the trial judge had previously rejected. The Superior Court denied that motion by order dated August 27, 2003.[13]

### (4) The Rulings on ExxonMobil's *Claims For Breach of Contract*

At the conclusion of the trial, the jury found that SABIC was liable to ExxonMobil for having breached Article 6.3 of the joint venture agreements, which (the jury found) was controlling and required SABIC to limit its royalty charges for providing Unipol® PE technology to the partnerships to a "pass through" of SABIC's own cost of licensing that same technology from UCC. After the close of the evidence, SABIC moved for judgment as a matter of law on those contract claims. The trial court denied that motion.

After the jury verdict, SABIC renewed its motion for judgment as a matter of law or, alternatively, a new trial.[14] The basis of the renewed motion for judgment was that as a matter of law no reasonable jury could have found for ExxonMobil on their contract claims. The thrust of SABIC's alternative motion for a new trial was that the great weight of the evidence established that the 1980 Unipol® PE licenses had superseded and/or modified the joint venture agreements.[15]

The trial court denied both motions, holding that: (a) a reasonable jury could have found that Article 6.3 (which required a cost pass through) governed the terms under which SABIC could sublicense the Unipol® PE technology to the joint ventures; and (b) the record dispositively negated SABIC's contention that specific joint venture polyethylene licenses entered into in October and November 1980 had superseded or "trumped" Article 6.3 of the joint venture agreements, because Exxon and Mobil did not sign the sublicenses, and did not understand or intend that the sublicenses would operate to supersede Article 6.3.[16]

---

12. *Saudi Basic Indus. Corp.*, 2003 WL 22048238 at *2–*5, *8–*9 (Del.Super.Sept.2, 2003).

13. *Saudi Basic Indus. Corp.*, 2003 WL 22048236 at *5 (Del.Super.Aug.27, 2003).

14. *Saudi Basic Indus. Corp.*, 2003 WL 22048236 (Del.Super.Aug.27, 2003)

15. *Id.* at *1.

16. SABIC's defense that Article 6.3 was superseded by the sublicenses was stricken by the Superior Court. On appeal, SABIC contends that it is entitled, at the very least, to a new trial at which that defense could be presented to the jury.

(5) The Rulings on ExxonMobil's *Tort Claims for "Usurpation"*

The jury also found SABIC liable to ExxonMobil for committing the tort known under Saudi law as usurpation (*ghasb*). The amount of the jury award for usurpation was $416 million, of which $92 million represented Exxon's and Mobil's *pro rata* share of the amounts that (the jury found) SABIC had overcharged for the Unipol® PE technology, and $324 million represented those parties' *pro rata* share of the profits that SABIC had earned through its use of the overcharges in its business operations.

Following the jury verdict, SABIC filed two separate motions for judgment as a matter of law or, alternatively, a new trial or remittitur on ExxonMobil's *ghasb* claims. In its first motion, SABIC sought judgment as a matter of law, claiming that there was no legally sufficient evidentiary basis for a reasonable jury to find for ExxonMobil, and that the evidence overwhelmingly supported a verdict in SABIC's favor.[17] Specifically, SABIC argued that the *ghasb* verdict was deficient as a matter of law because (1) the trial court declined to instruct the jury that under Saudi law, for SABIC to commit *ghasb* it must have acted "forcefully and with the victim's knowledge" (as distinguished from usurpation by secrecy or stealth), and (2) here, SABIC had acted secretively and without the victims' knowledge.[18]

The Superior Court denied that motion, ruling that (a) the court's determination of the Saudi law elements of *ghasb* on which it based the jury instruction was the culmination of many months of study, research, discussion and extensive expert testimony on Saudi law, including a separate live hearing on the subject;[19] (b) the court's rejection of the elements of "knowledge" and "force" advocated by SABIC was "consistent with the classical Hanbali authorities that would be followed by a Saudi judge;"[20] and (c) the jury verdict was not against the great weight of the evidence and indeed, was amply supported by the evidence.[21]

In its second (renewed) motion for judgment as a matter of law or, alternatively, a new trial or remittitur, SABIC contended that the damages award of $324 million (which SABIC characterizes as "enhanced damages"),[22] was unprecedented under Sa-

---

The Superior Court also rejected SABIC's contention that ExxonMobil had abandoned their contract claims, concluding that "this particular argument borders on frivolous and [that]...the record establishes, unequivocally, that ExxonMobil asserted, and continued to vigorously assert, its breach of contract claim and never stopped litigating this claim." 2003 WL 22048236 at *1. SABIC has not appealed that ruling.

17. *Saudi Basic Indus. Corp.*, 2003 WL 22016864 (Del.Super.Aug.26, 2003).

18. *Id.* at *2.

19. *Id.* at *1, *2.

20. The court found that the expert whose testimony was offered to support SABIC's view of the law, was "more of an advocate than an objective scholar of Islamic law." *Id.* at *4.

21. *Id.* at *5.

22. SABIC characterizes the $324 million component of the $416 million award as "enhanced damages," but at trial the Saudi law experts agreed that under Saudi law the injured plaintiff is entitled to recover compensatory damages for usurpation, which may include a return of the actual overcharged amounts *plus* the actual past profits obtained from the wrongful use of the overcharged amounts. Although SABIC's use of the term "enhanced damages" is vaguely suggestive of punitive damages, SABIC's expert, Dr. Frank E. Vogel, conceded that damages awarded for the tort of usurpation are not akin to punitive or exemplary damages.

udi law and, therefore, the jury should not have been allowed to award damages above the actual $92 million overcharge. Alternatively, SABIC argued, it was entitled to a new trial wherein the jury would be given adequate instructions on enhanced damages, rather than being led to believe that an enhanced damage award follows automatically once the elements of *ghasb* are established. Those instructions (SABIC urged) should include a list of six factors that a Saudi judge would consider, plus the admonition that "enhanced damages" are permitted only under the most "unusual or egregious of circumstances."[23]

The Superior Court denied SABIC's motion, finding that its jury instruction relating to *ghasb* damages was correct and that the *ghasb* damages award was not against the great weight of the evidence. Specifically, the trial judge ruled that: (a) SABIC's argument that damages for *ghasb* are virtually unprecedented and rarely awarded in the Saudi legal system, was unsubstantiated, unverifiable and irrelevant;[24] (b) the jury instruction properly left any award of usurpation damages to the jury's discretion; (c) the six factors on which SABIC argued that the Court should have instructed the jury had no foundation in Saudi law as determined after a studied analysis based upon the authoritative texts; and (d) instructing the jury on the factors advocated by SABIC would be misleading and, in some cases, would invite inappropriate speculation.[25]

### c. *Proceedings After The Filing of This Appeal*

After it commenced this appeal, SABIC filed a motion in this Court to supplement the record to include what SABIC charac-

terized as an "official statement of Saudi Arabian law issued by the Ministry of Justice of Saudi Arabia." That "official statement" had never been presented to, or considered by, the trial court whose determinations of Saudi law had become final, subject only to review by this Court. SABIC's motion was also filed without leave of this Court. ExxonMobil vigorously opposed the motion. Weeks later, SABIC filed a motion to remand the case to the trial court to reconsider certain of SABIC's post trial motions for judgment as a matter of law, or alternatively for a new trial, in light of its newly-filed "official statement of Saudi law." This Court denied both motions as procedurally improper on January 29, 2004.

### ANALYSIS OF SABIC'S CLAIMS OF ERROR

### (1) THE STATUTE OF LIMITATIONS RULINGS

#### (a) *The Issues Presented*

Before the trial, SABIC moved for summary judgment as a matter of law on the ground that the application of Delaware's borrowing statute[26] resulted in ExxonMobil's twenty-plus year old claims being barred by Delaware's three year statute of limitations, 10 *Del. C.* § 8106. SABIC claimed that Exxon and Mobil had inquiry notice of their overcharge claims no later than 1994, and that there was no legal basis to toll the running of the statute. More specifically, SABIC argued that: (i) because ExxonMobil's claim arose "outside of Delaware" (*i.e.*, in Saudi Arabia), the limitations periods prescribed by both Delaware and Saudi Arabian law were poten-

23. *Saudi Basic Indus. Corp.*, 2003 WL 22016843 at *1, *2 (Del.Super.Aug.26, 2003).

24. *Id.* at *3.

25. *Id.* at *2.

26. 10 *Del. C.* § 8121.

tially applicable; (ii) Delaware's borrowing statute required the Superior Court to apply the shorter of those two potentially applicable limitations periods; (iii) in this case, the shorter period of limitations was the three year period prescribed by Section 8106, and as result, ExxonMobil's claims were time-barred.

In a pretrial bench ruling, the trial judge denied the motion, holding as a matter of law that the borrowing statute did not apply and that ExxonMobil's claims were not time-barred under substantive Saudi law principles. Under Saudi law (which, all parties agree, governs Exxon-Mobil's contract and tort claims), property rights (including ExxonMobil's claims) are eternal and cannot be extinguished by the passage of time. As the trial judge explained:

> The Delaware borrowing statute, the purpose of it, is (a) to prevent forum shopping; and[](b) [] to protect the residents of Delaware.

> To apply the borrowing statute and [conclude] that Delaware's statute of limitation[s] would apply would basically turn the borrowing statute on its head for the purpose for which it was enacted. SABIC purposefully chose this forum. And all indications strongly suggest that they chose this forum to obtain a shorter statute of limitations. So it [is] somewhat of a twist; in that, usually these cases involve a plaintiff who chooses this forum, hoping to get a longer statute of limitations.... So here, it's a twist on the normal set of facts. But the bottom line is: Our legislature intended to prevent people out of state, foreign plaintiffs, from coming into this forum and getting the benefit of a statute of limitations that really ought not to apply given

the fact that the substantive law is interwoven with the procedural right.

> And here because Saudi law makes it clear and the parties don't dispute that Saudi law makes it clear, that a property right is eternal. And there is no concept in Saudi law that the usurper of the property can rely on the passage of time to extinguish claims.

On that basis, the trial court ruled that ExxonMobil's claims were not time-barred as a matter of law. That ruling, SABIC contends, is erroneous because: (1) the Delaware borrowing statute does apply and as a result, makes applicable the shorter (three year) Delaware statute of limitations, which bars ExxonMobil's claims; (2) the three-year statute was not tolled or, alternatively, any tolling had ceased by 1994; and (3) even payments made by ExxonMobil within the three-year limitations period (*i.e.*, after 1997) are not recoverable because they represented continuing damages, as opposed to continuing wrongs.

SABIC's contentions frame the limitations-related issues, which are *first*, whether Delaware's borrowing statute applies; *second*, if so, whether the Delaware three year statute of limitations was tolled and if so, for how long; and *third*, whether post–1997 royalty payments made within the three year limitations period are also time-barred. We review these claims *de novo* for errors of law.[27] For the reasons next discussed, we uphold the trial judge's determination that the Delaware borrowing statute (and, as a consequence the Delaware three year statute of limitations) does not apply. We further conclude that, independent of the borrowing statute, the Delaware tolling statute tolled any limitations

---

**27.** *City Investing Co. Liquidating Trust v. Cont'l. Cas. Co.,* 624 A.2d 1191 (Del.1993); *Chrysler Corp. (Del.),* 822 A.2d at 1031, 1035.

period until SABIC commenced this action in July 2000, because before that time SABIC was not amenable to suit in Delaware and, therefore, was "out of the State" for tolling statute purposes.

(a) *Applicability of The Borrowing Statute*

■ It is undisputed that if Saudi law governs the limitations issue, then ExxonMobil's claims are not subject to any bar of limitations; but if Delaware law governs the limitations question, then the three-year statute applies and (absent tolling) bars ExxonMobil's claims.[28] The issue of which law applies turns upon whether the Delaware borrowing statute is applicable. That statute provides:

> Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply.[29]

This statute, if literally read and applied, would cause the three-year Delaware limitations statute to govern ExxonMobil's overcharge claim. SABIC urges us to adopt such a literal reading. SABIC argues that under the first sentence of Section 8121, ExxonMobil's cause of action arose "outside of this State," *i.e.*, in Saudi Arabia. Therefore, the applicable limitations period must be prescribed by Delaware law, which is the "shorter" of the "time limited by the law of this State" (Delaware: three years) and "the time limited by the law of the . . . country where the cause of action arose" (Saudi Arabia: no limitations period). Moreover, SABIC argues, the application of Delaware's three year statute is similarly mandated by its second sentence, because the two joint venture partnerships were "resident[s] of this State" at the time the "cause of action originally accrued."

■■ The infirmity in SABIC's argument is that its literal construction of the borrowing statute, if adopted, would subvert the statute's underlying purpose. Our case law precedent eschews such a construction. As both this Court and the trial court have recognized, borrowing statutes "are designed to prevent shopping for the most favorable forum. . . ."[30] To accomplish that purpose, those statutes are normally designed to "shorten the time limit—not to extend it."[31] Borrowing statutes such as Section 8121 are typically designed to address a specific kind of forum shopping scenario—cases where a plaintiff brings a claim in a Delaware court that (i) arises under the law of a jurisdiction other than Delaware and (ii) is barred by that jurisdiction's statute of limitations but would not be time-barred in Delaware, which has a longer statute of limitations. Under that "standard scenario," the bor-

---

**28.** Given our disposition of this issue, we do not reach SABIC's contention that the post-1997 royalty payments would not be recoverable.

**29.** *10 Del. C.* § *8121*.

**30.** *Pack v. Beech Aircraft Corp.*, 132 A.2d 54, 58 (Del.1957).

**31.** *Id., citing* 63 Harv. L.Rev. 1177, 1263 *Developments in the Law: Statutes of Limitation,* (1950) ("Borrowing statutes provide only a shorter time limit than the local period, which is still applicable to bar an action not barred by the borrowed foreign limitation.").

rowing statute operates to prevent the plaintiff from circumventing the shorter limitations period mandated by the jurisdiction where the cause of action arose.

Our decision in *Pack v. Beech Aircraft Corporation* illuminates that purpose. In *Pack*, the plaintiff brought a wrongful death action in a Delaware court under the New Jersey Wrongful Death Statute, which had a "built in" two-year statute of limitations. Had the lawsuit been brought in New Jersey it would have been time-barred, because the suit was not filed until after the two-year limitations period had expired. The plaintiff argued that the action was not time-barred, because the applicable statute was not the New Jersey statute but the Delaware three-year statute of limitations. Rejecting that argument, this Court held that Delaware's borrowing statute would be applied in order to enforce New Jersey's "built in" two-year limitations period:

> If a non-resident chooses to bring a foreign cause of action into Delaware for enforcement, he must bring the foreign statute of limitations along with him if the foreign statute prescribes a shorter time than the domestic statute. Our statute does not apply to a resident of this State suing on a foreign cause of action provided he was a resident when the cause of action arose. As to such a resident the common law rule that the *lex fori* governs the matter of limitations of actions is left in full force.[32]

Although the plaintiff in *Pack* was a resident of Delaware, this Court recognized that a literal application of the second sentence of Delaware's borrowing statute to that particular plaintiff would *extend*, rather than shorten, the applicable limitations period. This Court declined to apply the borrowing statute in such a literal way, because to do so would undercut the overriding purpose of borrowing statutes, which is "to prevent shopping for the most favorable forum." Because the two-year limitations period was "built in" to New Jersey's statutory cause of action for wrongful death, this Court applied Delaware's borrowing statute so as to "enforce the New Jersey law as we find it."[33]

The sane reasoning that led this Court to eschew a literal application of the borrowing statute in *Pack*, requires us to uphold the reasoning of, and the result reached by, the trial court in this case. Here, ExxonMobil's claims arose under Saudi law, which imposes no time bar upon those claims. If ExxonMobil had prosecuted their overcharge claims in Saudi Arabia, their claims would not be time-barred. But ExxonMobil did not assert these claims in Saudi Arabia, or bring suit in Delaware as plaintiff to enforce those claims against SABIC. Rather, it was SABIC who came to Delaware to obtain an adjudication that (*inter alia*) Delaware's three year statute of limitations barred ExxonMobil's claims. Given the nature of SABIC's affirmative claim for declaratory relief, ExxonMobil was entitled to assert its overcharge causes of action as counter-claims for damages. In these circumstances, as the trial judge found, the party that was "shopping for the most favorable forum" was SABIC, not ExxonMobil.

The trial judge recognized that to apply the borrowing statute to ExxonMobil would subvert the statute's fundamental purpose,[34] by enabling SABIC to prevail

---

**32.** *Pack,* 132 A.2d at 57.

**33.** *Id.* at 60.

**34.** The correctness of the trial court's construction of the borrowing statute is also supported by other Delaware precedent. In *Air Prod. & Chem., Inc. v. Lummus Co.,* 252 A.2d 543 (Del.1969), the plaintiff (like SABIC here)

on a limitations defense that would never have been available to it had the overcharge claims been brought in the jurisdiction where the cause of action arose, *i.e.*, Saudi Arabia. Because the Superior Court properly ruled that the borrowing statute did not apply, it follows that that court also correctly held that ExxonMobil's counterclaims to recover the royalty overcharges were not time-barred.

### (b) *The Application of The Tolling Statute*

■ The conclusion that ExxonMobil's counterclaims were not time-barred was correct for a second, independent reason. Even if the borrowing statute did apply and thereby triggered Delaware's three-year statute of limitations, Delaware's tolling statute stopped the running of the three-year statute until SABIC filed this action in Delaware and as a result, became amenable to service of process. Our tolling statute provides:

> If at the time when a cause of action accrues against any person, such person is out of the State, the action may be commenced, within the time limited therefor in this chapter, after such person comes into the State in such manner that by reasonable diligence, such person may be served with process. If,

after a cause of action shall have accrued against any person, such person departs from and resides or remains out of the State, the time of such person's absence until such person shall have returned into the State in the manner provided in this section, shall not be taken as any part of the time limited for the commencement of the action.[35]

It is settled law that the purpose and effect of Section 8117 is to toll the statute of limitations as to defendants who, at the time the cause of action accrues, are outside the state and are not otherwise subject to service of process in the state.[36] In those circumstances, the statute of limitations is tolled until the defendant becomes amenable to service of process.[37]

Here, SABIC was "out of the state" and service of process upon SABIC could not have been accomplished in Delaware. Because SABIC lacked significant contacts with Delaware before it filed this lawsuit, the Delaware courts would have lacked personal jurisdiction over SABIC. Therefore, ExxonMobil could not have obtained personal jurisdiction over SABIC in Delaware. Only by voluntarily initiating this action in Delaware as plaintiff did SABIC "come[] into the State" and thereby become amenable to service of process.[38]

filed a preemptive action in Superior Court seeking a declaratory judgment that the defendant's threatened contract claim was barred by Delaware's three-year statute of limitations. There, as here, the contract claim had no relationship with the forum state (Delaware), and arose under the law of Puerto Rico, whose period of limitations was fifteen years. This Court required the declaratory judgment plaintiff, as a condition to requiring the litigation to proceed in Delaware, to stipulate that the Delaware borrowing statute would not be asserted as a defense. *Id.* at 545.

**35.** 10 *Del. C.* § 8117.

**36.** *Hurwitch v. Adams,* 155 A.2d 591, 594 (Del.1959).

**37.** *Brossman v. FDIC,* 510 A.2d 471, 472–73 (Del.1986) (statute of limitations tolled until the effective date of the Delaware long-arm statute because prior to that time the nonresident defendant was not amenable to service of process).

**38.** Shortly after SABIC filed this action, ExxonMobil commenced an action in the New Jersey federal court, raising claims similar to its counterclaims here. SABIC immediately sought to dismiss that action, claiming that it was immune from suit under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C.

Thus, even if the three-year Delaware statute of limitations were found applicable to ExxonMobil's claims, the running of that statute was tolled until the date that SABIC filed its Superior Court action.[39]

We conclude, for these reasons, that the Superior Court did not err by rejecting SABIC's defense (and claim-in-chief) that ExxonMobil's counterclaims are barred by the statute of limitations.

## (2) THE EVIDENTIARY RULINGS

█ We turn next to SABIC's claim that the trial judge made four erroneous evidentiary rulings. We review rulings on the admission of evidence for abuse of discretion.[40] Where a court "has not exceeded the bounds of reason in view of the circumstances and has not so ignored recognized rules of law or practice so as to produce injustice, its legal discretion has not been abused." [41] We conclude that none of the contested evidentiary rulings constituted an abuse of discretion.

█ (a) The first contested trial court ruling,[42] is the exclusion of SABIC's proffered testimony of Ibrahim Bin Salamah, the SABIC official who negotiated the joint venture agreements. The proffered testimony was that Mr. Bin Salamah had personally told his counterparts at Exxon and Mobil that SABIC would receive a

margin or "mark-up" on the Unipol® PE technology. That testimony, if allowed, would have contradicted the testimony of SABIC's Rule 30(b)(6) representative, Dr. Richard Pai, whom ExxonMobil had deposed three times. On each of those occasions Dr. Pai testified that SABIC always intended to charge the joint ventures a margin on the Unipol® PE technology, but had never informed Exxon, Mobil, Kemya or Yanpet of its intent. The proposed new testimony would also have directly contradicted Ben Salamah's previous deposition testimony—given only days before trial—that SABIC "never talk[ed] about the margin;" as well as SABIC's October 4, 2002 interrogatory responses, filed shortly before the trial, that expressly adopted Dr. Pai's testimony. Lastly, the proffered new testimony would have contradicted SABIC's responses to ExxonMobil's requests for admissions, in which SABIC represented that it had "no information that shows, one way or the other" whether SABIC had disclosed the royalty mark-ups to the joint ventures or to ExxonMobil.

Granting ExxonMobil's motion *in limine*, the trial court prohibited Mr. Bin Salamah from giving his proffered new testimony, on two grounds. First, that testimony would reverse all of SABIC's prior positions on this issue; and second,

---

§ 1602 et. seq. ("FSIA") and could not be sued anywhere in the United States. The United States District Court for the District of New Jersey held that SABIC's filing suit in New Jersey waived any FSIA immunity as to the overcharge claims in New Jersey and the Delaware courts. *Saudi Basic Indus. Corp.*, 194 F.Supp.2d at 401–03, *vacated in part and remanded on other grounds*, 364 F.3d 102 (3rd Cir.2004) (holding that the *Rooker–Feldman* doctrine deprived the federal court of subject matter jurisdiction over suit by ExxonMobil once final judgment on the identical issue was granted by the Delaware Superior Court.), *cert. granted*, —— U.S. ——, 125 S.Ct. 310, 160 L.Ed.2d 221 (2004).

**39.** It is undisputed that ExxonMobil asserted their overcharge counterclaims well within the three-year period from the filing of SABIC's complaint.

**40.** *Bell Sports, Inc. v. Yarusso*, 759 A.2d 582, 590 (Del.2000); *Lilly v. State*, 649 A.2d 1055, 1059 (Del.1994).

**41.** *Firestone Tire and Rubber Co. v. Adams*, 541 A.2d 567, 570 (Del.1988).

**42.** That ruling was one of several bases of SABIC's post-verdict motion for a new trial.

the reversal of position would be highly prejudicial. The proffered testimony was never disclosed to ExxonMobil until SABIC filed its reply brief in support of its motion for summary judgment—long after the discovery cut-off date and at a time that ExxonMobil was effectively foreclosed from countering the new testimony. The persons to whom Mr. Bin Salamah had supposedly revealed this information were not available either to be re-deposed or to be called as rebuttal witnesses at trial. By that point in time, one of those witnesses had died and the other (who was never questioned about this subject at his deposition) was unavailable to testify at trial. Not surprisingly, the trial judge ruled that:

> [I]t was SABIC's conduct during discovery that resulted in exclusion of this testimony. Simply stated, had SABIC complied in good faith with the letter and spirit of our discovery rules before trial, the Court would probably not have been forced to exclude this portion of Mr. Bin Salamah's testimony.[43]

The trial court reasoned that Mr. Bin Salamah's new testimony was reasonably available to SABIC at all times during the discovery period; that Rule 30(b)(6) required SABIC's counsel to review that testimony with Mr. Bin Salamah before submitting the (contrary) Rule 30(b)(6) deposition testimony of Dr. Pai (as the spokesperson for the SABIC organization); and that the consequences of counsel's failure to do that should fall upon SABIC, not ExxonMobil.[44] On the basis of "fundamental fairness," [45] the trial court concluded that to have "allowed Mr. Bin Salamah to testify on this subject...would have rewarded SABIC for discovery techniques that do not pass muster in this Court and would have resulted in a thorough sandbagging of ExxonMobil." [46]

We agree. Given these facts, the trial court's evidentiary ruling could not possibly constitute an abuse of discretion. Mindful of that, SABIC attacks the ruling's factual and legal predicates. SABIC argues (contrary to the trial judge's finding) that Mr. Bin Salamah's new testimony would not have contradicted that of Dr. Pai, and that SABIC's counsel was not procedurally obligated to consult with Bin Salamah before Dr. Pai's Rule 30(b)(6) deposition. That argument amounts to little more than assertion without support in the record. Nowhere does SABIC come to grips with the case law that supports the trial judge's analysis and result. Having reviewed the record and applicable law, we conclude that the trial court's ruling is solidly grounded in both law and fact, and that SABIC's contrary arguments lack merit.

■ (b) The second contested evidentiary ruling was the admission into evidence of an internal memorandum by Exxon employee, John Webb, reflecting representations made by Mr. Bin Salamah in 1986, that the royalty rate called for by the SABIC/UCC license agreement for the Unipol® PE technology was identical to the royalty rate required by the SABIC–Kemya license agreement. SABIC claims that the Webb memorandum was admitted erroneously, because it was hearsay. The trial court, however, admitted the document as past recollection recorded, which is a recognized exception to the

43. *Saudi Basic Indus. Corp.*, 2003 WL 22048238 at *3 (Del.Super.Sept.2, 2003).

44. *Id.* at *4–*5.

45. *Id.* at *3.

46. *Id. at *5.*

hearsay rule.[47] We find no abuse of discretion in the admission of that document. Nor was SABIC prejudiced by its admission into evidence. The trial court gave SABIC the opportunity to cross-examine Webb about the memorandum and also to call Mr. Bin Salamah and elicit his denial that he made any statement to Webb. SABIC availed itself of both opportunities.

(c) The third contested evidentiary ruling is the admission of the testimony of two ExxonMobil employees, George Fitzpatrick and Robert Murphy, to the effect that SABIC had promised ExxonMobil a "pass through" license, and had represented (to Messrs. Fitzpatrick and Murphy) that SABIC had "passed through" its billings to Kemya and Yanpet at SABIC's cost. SABIC claims that this testimony was "multiple hearsay." That contention is misguided. A statement is not hearsay if offered only to prove that the statement was made, rather than for the truth of the matter asserted.[48] Here, Fitzpatrick's testimony about SABIC's statements was offered to rebut SABIC's defense that Exxon had waived its breach of contract claim, by showing that Exxon did not know about the overcharge and therefore could not have intentionally relinquished a known right. Nor could the out-of-court statement attributed to SABIC (that there was no overcharge) have been offered for its truth, because the truth was the precise opposite.

Mr. Murphy's disputed testimony was also to the effect that SABIC had promised a "pass through" license and that it had passed through its billings to Kemya and Yanpet at SABIC's cost. Murphy's testimony also was not hearsay because it was not offered for its truth. The statement was offered to correct a misimpression, created during Murphy's cross-examination, that Murphy had been told that SABIC intended to make a profit from furnishing the Unipol® PE technology, yet despite being so informed, ExxonMobil made no effort to follow up on that disclosure. Nor was the Murphy testimony prejudicial, because Murphy had previously testified that he received assurances from SABIC that the UCC royalties would be passed through directly to Yanpet.

(d) The fourth contested evidentiary ruling concerns the limitation by the trial court of the scope of SABIC's proffered evidence of Exxon's subjective intent in connection with ExxonMobil's possibly providing polyethene technology to the joint ventures. SABIC attempted to prove Exxon's intent by offering into evidence drafts of never-executed agreements that predated the joint venture agreements. The trial judge excluded only the evidence and testimony that pertained to Exxon's internal state of mind, as distinguished from specific objective communications to and by SABIC on this subject (which were admitted). The trial court reasoned that Exxon's intent regarding never-executed agreements that predated the joint venture were not probative of Exxon's state of mind as of the later time when the parties did execute the joint venture agreements. This ruling was a rational exercise in determining the bounds of relevancy. Even more important, the ruling did not prejudice SABIC, which was permitted to introduce evidence of the earlier negotiations as of the time that (it appeared) Exxon and Mobil might provide the polyethylene technology to the joint ventures. Moreover, in closing argument SABIC's counsel was permitted to (and did) argue that SABIC believed that a

---

47. D.R.E. 803(5).

48. D.R.E. 801(c); *Fawcett v. State*, 697 A.2d 385, 387 (Del.1997).

royalty mark-up was acceptable, based upon the parties' early negotiations relating to the possible provision of the technology by Exxon and Mobil. The jury chose not to credit that argument, however.

For these reasons, none of the contested evidentiary rulings constituted an abuse of discretion.

### (3) THE RULINGS ON SABIC'S RE-LEASE DEFENSE

■ SABIC's third claim of error is that the trial court improperly struck SA-BIC's release defense. SABIC argues that the 1987 Letter Agreements, wherein ExxonMobil and SABIC renegotiated the joint ventures' license fees, operated to release all of ExxonMobil's payment-related claims against SABIC.[49] Because the court dismissed that defense as a matter of law, we review its ruling *de novo* for legal error.[50]

The trial judge ruled the release defense out of the case for three independent reasons. The first was that neither Exxon nor Mobil had signed the 1987 Letter Agreements; the second was that the plain language of those Agreements limited the scope of any release to technology-related claims and did not include payment-related claims; and the third was that the only evidence on this issue from a Saudi law expert was the unrebutted testimony of Professor Hallaq, who opined that the 1987 Letter Agreements would not affect ExxonMobil's claims as a matter of law. We

conclude that the trial court ruled correctly in all respects.

Articles 18.2 and 19.2 of the joint venture agreements expressly require that any "amendment, modification, or waiver of any provision" must be "in writing and signed by the Partners." The term "Partners" is defined to mean SABIC and Exxon (in the Kemya Agreement) and SABIC and Mobil (in the Yanpet Agreement). Because Exxon and Mobil did not sign, and were not parties to, the 1987 Letter Agreements, they cannot be found to have waived claims under the joint venture agreements. The express requirement of a signature by the "Partners" in the joint venture agreement provisions, and the absence of any actual signatures by Mobil or Exxon, disposes of SABIC's contention that "the Exxon and Mobil partners [Kemya and Yanpet] *are deemed* to have signed the agreements. . .because [they] were the joint venturers, and because they accepted the lucrative benefits of those agreements."[51]

In addition, the scope of the release provisions in the 1987 Letter Agreements is clearly limited to "UCC LDPE Technology" and "UCC HDPE Technology." Both terms are limited in the sublicenses to "technical information and data." There is no evidence that the parties (SABIC, Kemya and Yanpet) intended a meaning different from that connoted by the agreement's plain language.[52] Fur-

---

**49.** SABIC argues that the trial court erred by granting ExxonMobil judgment as a matter of law on the release defense, and by denying SABIC's post-verdict motion for judgment as a matter of law on the basis of that same (previously stricken) defense of release.

**50.** *Chrysler Corp. (Del.)*, 822 A.2d at 1031, 1035.

**51.** That argument lacks even facial coherence in the case of the 1987 Letter Agreement

between Yanpet and SABIC, because that agreement was signed on behalf of Yanpet by SABIC's Bin Salamah, who knew—but concealed from Mobil—that SABIC had received from UCC a larger discount than it was passing on to the joint ventures.

**52.** Freddie Merrell, who was president of Yanpet at the time, testified that he did not believe that Yanpet was releasing any payment-related claims in the 1987 Letter Agreement. Similarly, Gregory McPike, who was a

thermore, Professor Hallaq testified that under Saudi law, a release regarding the "object of the contract" (here, technology) cannot be construed as a release of claims relating to payment. That testimony is unrebutted.

Finally, as the trial court pointed out, Professor Hallaq, who was the only Saudi law expert who offered an opinion on the purported release, testified that even if the release language could be construed to cover claims for payment, under Saudi law the representations of Kemya and Yanpet in the 1987 Letter Agreements "are not binding and do not in any way preclude ExxonMobil's payment claims in this case." The reason (Hallaq testified) was that SABIC never disclosed that its royalty payments to UCC were less than Kemya's and Yanpet's royalty payments to SABIC. As a result, SABIC's representations in the 1987 Letter Agreements were "not accurate or complete." That testimony also stands unrebutted.

We conclude, for these reasons, that the trial court committed no error in dismissing SABIC's release defense as a matter of law.

### (4) THE RULINGS ON EXXONMOBIL'S BREACH OF CONTRACT CLAIMS

By its verdict the jury found SABIC liable to ExxonMobil for having breached Article 6.3 of the joint venture agreements.[53] Those provisions (the jury determined) were controlling and limited SABIC's royalty charges for providing Unipol® PE technology to the partnerships, to a "pass through" of SABIC's own cost of obtaining a license for that same technology from UCC. During the trial, SABIC moved for judgment as a matter of law on ExxonMobil's contract claim, and after the adverse jury verdict, SABIC moved (again) for judgment as a matter of law or, alternatively, for a new trial. The trial judge denied both motions and judgment was ultimately entered against SABIC on the contract claims.

On appeal, SABIC contends that the trial judge erred in denying its pre (and post) verdict motions for judgment because: (1) as a matter of law Article 6.3 does not apply to SABIC's provision of the Unipol® PE technology to the joint venture partnerships; rather, the parties intended that Article 6.1—which does not require a cost "pass through"—would control; and (2) in any event, the joint venture agreements do not govern what royalties SABIC could charge for providing the Unipol® PE technology to the joint venture partnerships. The reason (SABIC argues) is that the parties intended that the later-executed Unipol® PE/UCC technology sublicense agreements between SABIC and the joint venture partnerships— which have no "pass through" provision— would supersede and repeal any application of Article 6.3 of the joint venture agreements.[54]

---

member of the Kemya board at the time, testified that he did not believe the 1987 Letter Agreement had anything to do with releasing payment-related claims, and that he did not have authority to release a "$180 million claim" on behalf of Exxon.

**53.** Except where the context shows otherwise, the references (in the singular) to Article 6.3 and to Article 6.1, are to Articles 6.3 and 6.1 of both the Yanpet and the Kemya joint venture agreements.

**54.** Alternatively, SABIC contends that it is entitled to a new trial to allow SABIC to present to the jury the same contract defenses that were the subject of its motions for judgment as a matter of law. That contention lacks merit because SABIC was allowed to present those defenses to the jury, which chose not to accept them. 2003 WL 22048236 at *3. Because we conclude that the trial court correctly rejected the contentions that underlie SABIC's motions for judgment,

To the extent SABIC claims that the trial court determined the applicable law incorrectly, or instructed the jury erroneously, or failed to grant judgment as a matter of law because of legally insufficient evidence, we review those claims *de novo* for legal error.[55] We will not disturb a jury's findings of fact on the basis of legally insufficient evidence, however, if there is "any competent evidence upon which the verdict could reasonably be based."[56] Having applied the appropriate review standards to the facts and evidence of record, we discern no error of law in the trial court's rulings, or any legal insufficiency of evidence to support the jury verdict, with respect to ExxonMobil's breach of contract claims.

(a) *SABIC's Argument That Article 6.3 Does Not Apply To ExxonMobil's Claims For Breach of Contract*

Our analysis of SABIC's first challenge to the judgment for breach of contract starts with the uncontested fact that when SABIC furnished the Unipol® PE technology to the joint venture partnerships, SABIC did not limit its royalty charges to the partnerships to a "pass through" of its own cost to procure that technology from UCC. It is undisputed that SABIC charged the partnerships a "mark up" over and above its actual cost. The record discloses substantial evidence (based upon which the jury found as fact) that SABIC had concealed those markups from ExxonMobil for almost two decades.

SABIC virtually concedes that those facts would constitute a violation of Article 6.3 of the joint venture agreements, *if* (as the jury found) Article 6.3 governs the overcharge breach of contract claims. SABIC can hardly contend otherwise, as Article 6.3 of the Yanpet agreement directs that "to the extent either Partner or any Affiliate thereof procures patents, processes, and other licensing rights of third parties, and sublicenses such rights to the Partnership, *it shall not receive any remuneration other than actual cost incurred in acquiring and sublicensing such right.*"[57] Article 6.3 of the Kemya joint venture agreement is substantially identical. SABIC's position must therefore be (and indeed is) that Article 6.3 does not govern the overcharge claims. That position contains two prongs.

SABIC first argues, as it did in the Superior Court, that Article 6.3 does not apply to the Unipol® PE technology that SABIC licensed to the joint ventures. According to SABIC, Article 6.3, by its plain terms, applies only to partner-*licensed* polyethylene technology that is then sublicensed to the joint ventures, as distinguished from partner-*owned* polyethylene technology that is then licensed to the joint venture. SABIC argues that the parties intended that Article 6.1(a)—which does not require a cost pass-through but instead allows the parties to negotiate transaction-specific financial terms—would apply to partner-owned polyethylene technology. Article 6.1, SABIC asserts, "plainly reflects the parties' intent that separate, later-executed technology [l]icenses, not the

---

and that the jury's verdict (which was adverse to SABIC) is based upon competent and legally sufficient evidence, we do not further address SABIC's new trial argument.

55. *Chrysler Corp. (Del.)*, 822 A.2d at 1034, 1036; *City Co. Liquidating Trust v. Cont'l. Cas. Co.*, 624 A.2d 1191, 1194 (Del.1993).

56. *Mercedes–Benz of N. Am. Inc. v. Norman Gershman's Things to Wear*, 596 A.2d at 1358, 1362 (Del.1991) (quoting *Turner v. Vineyard*, 80 A.2d 177, 179 (Del.1951)).

57. Yanpet Joint Venture Agreement, Art. 6.3 (italics added).

[joint venture] agreements, would exclusively govern the provision by a partner of the technology 'required' to 'manufacture' polyethylene." Because SABIC owned the Unipol® PE technology, Article 6.3 does not apply and therefore (SABIC concludes), no breach of Article 6.3 could legally have occurred.

The Superior Court rejected this argument on the ground that it ignores the plain language of Articles 6.3 and 6.1, as well as the substantial persuasive evidence that undermines SABIC's position. We conclude that the trial court ruled correctly. SABIC's entire position rests upon a distinction between partner-licensed and partner-owned polyethylene technology. Article 6.3, however, makes no such distinction. Article 6.3 does not exclude partner-*owned* polyethylene technology from its coverage. Indeed, that provision covers technology that a partner "procures," and as the trial judge held, "[a] reasonable jury could conclude that 'procures' includes a 'purchase.' In fact…a number of witnesses at trial…testified that 'procures,' as it appears in Articles 6.3, would include a purchase of technology.' "[58]

SABIC's distinction does not aid its position for a second reason: a reasonable jury could have found that SABIC was a licensee, not the owner, of the Unipol® PE polyethylene technology. That technology SABIC then sublicensed to the partnerships—the very scenario that is contemplated and covered by Article 6.3. The trial court so held:

> SABIC's argument that it purchased the Unipol® PE technology and then licensed it to the Joint Ventures rings hollow in light of the great weight of evidence in the form of documents that refer to *sub* licenses…. The record is

replete with documents referencing the UCC–SABIC transaction as a license and the SABIC Joint Venture transactions as sublicenses. SABIC's witnesses attempted to explain to the jury that while the term "sublicense" may have been used, SABIC "attached no legal meaning" to that term. The overwhelming documentary evidence supports the jury's finding that the true character of the UCC–SABIC agreement was a license, that the agreements with KEMYA and YANPET were sublicenses, and that Articles 6.3 applied.[59]

■ SABIC next argues that the evidence conclusively establishes that the parties intended for Article 6.1 of the joint venture agreements (which contains no pass-through requirement)—not Article 6.3 (which does)—to govern the terms under which SABIC could sublicense the Unipol® PE technology to the joint venture partnerships. Only if the plain language of Article 6.1 is ignored can this argument attain plausibility, because in fact Article 6.1 fatally undercuts SABIC's claim.

Article 6.1(a) of the Kemya joint venture agreement provides that:

> To the extent patents and licensing rights and related technical proprietary information are in the opinion of the Partners required to design and construct the Petrochemical Plant and produce Manufactured Products, *ECAI* [Exxon Chemical Arabia Inc.] *and its affiliates* to the extent they are permitted (without having to account to a third party) shall offer to provide to the Partnership, all such patents, licensing rights, technical and proprietary information necessary to perform its obli-

---

**58.** *Saudi Basic Indus. Corp.*, 2003 WL 22048236 at *3.

**59.** *Id.* (internal footnotes omitted).

gations hereunder consistent with Annex XI hereto.[60]

Article 6.1 explicitly and specifically refers to Exxon and Mobil, but that provision does not in any way mention, refer or even allude to SABIC. For that reason alone the jury had a reasonable basis to find that Article 6.1 does not apply to SABIC and, therefore, confers no rights upon SABIC.

On appeal SABIC argues—as it did before the trial court and the jury—that the references to *"ECAI and its affiliates"* in Article 6.1 of the Kemya joint venture agreement, and to *"MOBIL and/or MOBIL Affiliates"* in Article 6.1 of the Yanpet joint venture agreement,[61] must be construed to mean *"a partner."* Under that construction, SABIC would be an "affiliate" of Mobil or Exxon because those entities are partners in the two joint ventures.

That argument labors under multiple infirmities. Nothing in the joint venture agreements or in any case law cited by SABIC persuasively supports, let alone compels, that interpretation. To read "affiliates" as including all entities with which Mobil and Exxon have formal relationships as partners—a construction that SABIC insists the jury was required to accept as a matter of law—would be odd, to say the least. SABIC was not an "affiliate" of Mobil or Exxon as that term is commonly and ordinarily understood.[62] To the con-

trary, SABIC was ExxonMobil's bargaining adversary, the party on the other side of the arm's-length negotiations that resulted in the joint venture agreements. Reuel Agarrado, SABIC's own witness, testified that Article 6.1 "does not apply to SABIC." There is no evidence that SABIC ever informed Exxon or Mobil that it was relying upon Article 6.1 when SABIC violated the pass-through terms of Article 6.3. Nor did SABIC ever allege in its original or amended complaint that it had relied upon Article 6.1.

Despite these infirmities, the trial court allowed SABIC to present its Article 6.1 argument to the jury, which ultimately rejected it. The jury's rejection of SABIC's argument has an ample and sufficient basis in the evidentiary record, as did the trial judge's post-trial ruling that the jury was justified in reaching that result:

> The Court notes that at trial ExxonMobil introduced a copy of [SABIC's] Second Amended Complaint...and Article 6.1 of the Joint Venture Agreements is nowhere mentioned in that complaint. The Court also notes that SABIC witnesses admitted that they never advised anyone at Exxon or Mobil that SABIC believed Article 6.1(a) applied to the provision of Unipol® PE technology to the Joint Ventures. Given all of this, there is more than a sufficient basis from which a reasonable jury could conclude

---

**60.** Kemya Joint Venture Agreement, Art. 6.1 (italics added). Article 6.1 of the Yanpet joint venture agreement is substantially identical. It provides:

> To the extent patents and licensing rights and other technical and proprietary information which are owned or controlled by *Mobil and/or Mobil Affiliates* are required to design and construct the Petrochemical Complex and manufacture the Manufactured Products, *Mobil and its Affiliates* shall provide all such patents and licensing rights and other technical and proprietary infor-

mation to the Partnership, necessary to perform its obligations hereunder on mutually agreeable terms and conditions.

Yanpet Joint Venture Agreement, Art. 6.1 (italics added).

**61.** See note 60 *supra.*

**62.** For example, SABIC was not a parent, or a subsidiary, or a sister corporation, of Exxon or Mobil, or of any person or group that controlled Exxon or Mobil.

that SABIC's Article 6.1(a) argument was an afterthought, and an unavailing one at that. This Court seriously considered precluding SABIC from presenting [that] argument...because of the lack of evidentiary basis supporting such an argument, and because the argument was not asserted until very late in [the] litigation.... After...characterizing SABIC's claim...as "hanging on by a thread," the Court nonetheless permitted SABIC to argue this to the jury over ExxonMobil's objection. Thus, SABIC had a full and fair opportunity to present this argument to the jury for its consideration. The jury rejected it.... [T]here is no basis to overturn the jury's rejection of that argument.[63]

We find that ruling to be free from error and correct.

(b) *SABIC's Argument That The Sublicenses Supersede And Repeal Any Application of Article 6.3*

■ Alternatively, SABIC contends that even if Article 6.3 does govern (thereby limiting SABIC's royalty charges to a pass through of its actual cost of obtaining the Unipol® PE technology), in this case Article 6.3 had no force or effect, because the SABIC/Kemya and SABIC/Yanpet sublicense agreements superseded and repealed any application of Article 6.3.

The trial court rejected this argument, holding that:

SABIC next argues that, under Saudi rules of contract interpretation, the Joint Venture polyethylene licenses which were entered into in November and October 1980 "trump" the general provisions of the Joint Venture Agreements, including Article 6.3. In support of this argument, SABIC states that under Saudi law, partnership agreements like the Joint Venture Agreements are *ja'iz* contracts, which are not prospectively binding on the partners but rather serve as a starting point for later, transaction-specific agreements. The later transaction-specific contracts are *lazim* agreements which are prospectively binding on the partners and "trump" inconsistent terms of *ja'iz* contracts. According to this argument, the detailed transaction-specific nature of the Unipol ® PE technology licenses makes them *lazim* contracts that supercede [sic] Article 6.3 of the Joint Venture Agreements. The infirmity of this argument is that there is no evidence in the record to suggest that Exxon or Mobil knew that SABIC was deriving a profit from its provision of the Unipol® PE technology to the Joint Ventures or that Exxon or Mobil knew the financial terms in the UCC–SABIC license. Thus, as a matter of law, the sublicenses cannot possibly modify Article 6.3 of the Joint Venture Agreements. In fact [on ExxonMobil's motion for judgment as a matter of law the Court pointed out that] on SABIC's contract modification argument, the parties' Saudi law experts agreed that...for there to be a modification of an agreement, the [parties] to the agreement must have conferred on the proposed modification and understood what they were agreeing to....

While the Saudi law experts who testified disagreed on many aspects of Saudi law, they did agree that it was not possible under Saudi law to modify an agreement unless the parties understood that they were modifying an agreement and understood the terms of the modification. There is no evidence in the record that Exxon or Mobil knew that the financial terms of the sublicenses were different than the UCC–SABIC li-

**63.** 2003 WL 22048236 at *3.

cense.... SABIC can point to no set of factual circumstances that suggest Exxon or Mobil understood, much less intended, that the sublicenses modified Article 6.3. The Court also notes that Article 18.2 of the KEMYA Joint Venture Agreement and Article 19.2 of the YANPET Joint Venture Agreement specifically require that any amendment, modification or waiver of any provision of the Joint Venture Agreement be in writing and signed by the partners. Dr. Hallaq testified that these provisions would be honored under Islamic principles of contract law. Because Exxon and Mobil, the partners, never signed the sublicenses...the sublicenses cannot possibly supercede [sic] or modify the Joint Venture Agreements as a matter of Saudi law.[64]

The above-quoted analysis effectively disposes of SABIC's argument that the sublicense agreements modified and superseded Article 6.3 of the joint venture agreements. Nothing advanced by SABIC on this appeal straightforwardly addresses the trial court's reasoning. SABIC asserts that the trial judge misunderstood the significance of the *ja'iz* nature of the joint venture agreements, but that assertion ignores the testimony of SABIC's own Saudi law expert, Professor Frank E. Vogel, that even *ja'iz* partnership contracts remain binding on the partners unless and until the partners reach agreement on the changed terms. That event never occurred here. As Professor Hallaq explained, under Saudi law, the sublicense agreements cannot be deemed to supersede the obligations upon which the parties agreed in Article 6.3 of the joint venture agreements, because no language in the sublicense agreements purports to waive SABIC's obligations to ExxonMobil under those that provision. "This absence of waiver," Professor Hallaq explained, "is dictated by the Islamic legal principle that unspecific, general or implied language cannot supersede specific and clear language which Articles 6.3...represent."[65]

SABIC's remaining challenges to the trial court's breach of contract rulings are equally unavailing.[66] The evidence amply suffices to sustain the jury's finding that the joint venture agreements, and specifically Article 6.3, controlled ExxonMobil's

**64.** 2003 WL 22048236 at *4 (internal footnotes omitted).

**65.** The expert testimony establishing the applicable principles of Saudi contract law vitiates SABIC's claim on appeal that the integration clauses of the sublicenses (which nowhere specifically purport to modify or supersede Article 6.3 of the joint venture agreements) must be regarded as *"conclusive evidence"* that the parties intended to supersede the prior joint venture agreements.

**66.** SABIC also assails the trial judge's determination that the sublicenses could not possibly modify or supersede the joint venture agreements because Mobil and Exxon did not sign the sublicense agreements. Exxon's and Mobil's actual signatures were not needed, SABIC argues, because the signature of SABIC—Exxon's and Mobil's partner in these joint ventures—was legally sufficient to bind Exxon and Mobil. This argument, like others advanced by SABIC, ignores the plain language of the governing contract. The joint venture agreements explicitly require that any amendment, modification or waiver of any provision of the joint venture agreements be "in writing and signed by the partners." The term "Partners" is defined in the Kemya agreement to mean SABIC and Exxon; and in the Yanpet agreement, is defined to mean SABIC and Mobil. SABIC's argument ignores the definition of "Partners," as well as the evidence provided by its own witness, Mr. Bin Salamah, who testified that when the partners intended to modify the joint venture agreement, they "sat down in a room and agreed in writing and signed it at the bottom of the page." It is undisputed that no authorized representative of Exxon and Mobil ever sat down in a room with SABIC and signed the sublicense agreements.

contract claims and was not superseded by the sublicense agreements. No authority that SABIC presented either to the trial court or to us required the trial judge or the jury to accept SABIC's contrary position as a matter of law. Because the jury verdict finding SABIC liable for breaching Article 6.3 of the joint venture agreements was properly grounded both legally and factually, it must stand.

### (5) THE RULINGS ON EXXONMO-BIL'S CLAIMS OF USURPATION (GHASB)

SABIC reserves its final and most extensive set of challenges for the portion of the judgment holding SABIC liable to ExxonMobil for committing the tort known under Saudi law as "usurpation" or "*ghasb*." The amount of the jury award and judgment for usurpation was $416.8 million, which includes both the amount of overcharged royalties ($92.8 million) and the profits SABIC obtained from using those overcharges in its business ($324 million).

SABIC divides its challenges to the usurpation award into two separate categories of claimed error: (1) errors that resulted in SABIC being held liable for usurpation, and (2) errors that resulted in an award of what SABIC describes as "enhanced damages."[67] For both categories, SABIC argues that it is entitled to judgment as a matter of law on ExxonMobil's *ghasb* claims of liability and enhanced damages; or alternatively, to a new trial

on both the liability and enhanced damages issues.

In support of its challenges SABIC advances five separate claims of error. First, SABIC contends that the trial court as a matter of law erred in denying its motion for judgment, because to be found liable for *ghasb* under Saudi law, Exxon-Mobil was required to—but did not—establish "an open and obvious taking that is intentional and without any color of right." SABIC argues that all ExxonMobil alleged and proved was that SABIC had engaged in "secret conduct...based upon color of right." Those contentions also form the basis for SABIC's second argument, which is that SABIC is entitled to a new trial on the issue of liability for *ghasb*, because the trial court erroneously declined to instruct the jury that the wrongdoer's actions must be "open, obvious, intentional and without color of right." Third, SABIC claims that it is entitled to judgment as a matter of law on the claim for enhanced damages, because no Saudi court would award enhanced damages in a contract case such as this one. Fourth, and alternatively, SABIC contends that it is entitled to a new trial in which the jury would be given adequate guidance in considering whether to award enhanced damages. Fifth, and finally, SABIC argues that the trial court, although purporting to employ the methodology that a Saudi judge would follow to determine the applicable Saudi law ("*ijtihad*"), in fact invoked *ijtihad* merely as a "*post hoc* rationalization" for foreign law rulings that were essentially arbitrary and unprincipled.[68]

---

**67.** SABIC characterizes the latter component of the usurpation award (the profits earned from the overcharges) as "enhanced damages," to accentuate its argument that a disgorgement of profits is "unprecedented" and should not have been allowed in this case. ExxonMobil, on the other hand, characterizes the entire amount of the award as "compensatory damages," to underscore its position

that past profits obtained by the tortfeasor's wrongful use of the overcharged amounts is an element of allowable damages for usurpation with "solid support" in the treatises of the Hanbali guild or school of Islamic law, the school that Saudi judges are instructed to follow.

**68.** Appellant's Op. Br. at 40–41.

To the extent SABIC contends that the Superior Court made incorrect determinations of Saudi law or instructed the jury incorrectly on issues governed by Saudi law, such determinations and jury instructions are treated as rulings on a question of law and are subject to *de novo* review.[69] But where, as here, the trial court's determination of foreign law rests on the credibility of foreign law experts, the trial court's predicate credibility findings will be accorded appropriate deference.[70]

(a) *The Trial Court's Use of The Ijtihad Methodology To Determine Saudi Law*

We first address SABIC's fifth argument, because it challenges the methodology that the trial court employed to determine Saudi law, and, thus by its very nature, assails the procedural foundation of all of the challenged substantive Saudi law rulings. In essence, SABIC claims that the *ijtihad* process that the trial judge employed to determine Saudi law was "free wheeling," "standardless," and a "bare 'guess' as to the correct content of Saudi law."[71] We reject these contentions, because the record clearly establishes that the trial judge went to extraordinary lengths to understand the applicable Saudi law and to make rulings that were consistent with the numerous Saudi law sources presented to her. To understand how and why that is so, a prefatory discussion of the Saudi system of jurisprudence, and of the Saudi *ijtihad* analytical approach, is helpful.

In Saudi Arabia, Islamic law (*shari'a*), which is a fundamentally religious law based on both the *Q'uran* and the model behavior of the Prophet Muhammed, is the law of the land. Although early Islamic law scholars eventually coalesced into various guilds or schools, only four of those guilds have survived in modern times: the Hanbali, the Hanafi, the Shafi'i and the Maliki. In Saudi Arabia, the judges are instructed to rule exclusively in accordance with the teachings of the Hanbali guild.[72]

The Saudi law system differs in critically important respects from the system of legal thought employed by the common law countries, including the United States. Perhaps most significant is that Islamic law does not embrace the common-law system of binding precedent and *stare decisis*. Indeed, in Saudi Arabia, judicial decisions are not in themselves a source of law, and

---

**69.** SUPER. CT. CIV. R. 44.1; *see Corbitt v. Tatagari*, 804 A.2d 1057, 1062 (Del.2002) (trial court's jury instructions reviewed *de novo* ); *J.S. Alberici Constr. Co. v. Mid–West Conveyor Co.*, 750 A.2d 518, 520 n. 2 (Del.2000) (foreign law determinations treated as rulings of law and reviewed *de novo* ).

**70.** *See, BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 268 (3rd Cir.2000) ("[T]he District Court is in the best position to determine what at this point is essentially a credibility issue—i.e, which [foreign law] expert to believe."); *Servicios Comerciales Andinos, S.A. v. Gen. Elec. Del Caribe, Inc.*, 145 F.3d 463, 476, n. 7 (1st Cir.1998) ("[T]he finder of fact is entitled to make its own assessment of the credibility of [foreign law] experts.").

**71.** SABIC also asserts that *ijtihad* was "raised for the first time in post-trial briefing" and that "the court never indicated prior to its post-trial orders that it was engaging in *ijtihad* to determine either the elements of *ghasb* or the availability of enhanced damages." *Id.* at 40. That assertion is contradicted by the record, which discloses that the trial judge questioned one of the expert witnesses about the *ijtihad* methodology during the Saudi law hearing, and that the judge indicated that she had relied upon that methodology in ruling upon a pre-trial motion for summary judgment.

**72.** Dr. Vogel, SABIC's Saudi law expert, agreed that Saudi judges hew conservatively to the Hanbali school.

with minor exceptions, court decisions in Saudi Arabia are not published or even open to public inspection.

The trial judge was keenly mindful of this distinctive characteristic of Saudi law and of the problems that it created for defining the elements of, and remedies for, *ghasb* and for how to instruct the jury on those issues. The court observed:

> SABIC's arguments ignore the simple truth that the circumstances under which *ghasb* (usurpation) damages are available under Saudi law are not well known, much less defined, because Saudi law is not based on precedent or *stare decisis*. Contrary to the implication of SABIC's briefing on this issue, the reality is that one cannot simply consult a statute book or a case reporter to find the elements of, or damages available for, the Saudi law tort of *ghasb*. Nor can one point to one definition of, or a given set of circumstances giving rise to, *ghasb*. To illustrate the extreme difficulty of discerning and interpreting Saudi law, the Court notes that none of the Saudi law experts who testified agreed on the proper elements of *ghasb* . . . . Finally, because Saudi law decisions are not published, even *if* the decisions had precedential value (which all the experts agree they do not) the Court could not look to decisions of Saudi judges to determine the proper elements or define the recoverable damages.[73]

Instead of relying upon statutes or decisional precedent to discern the law applicable to a particular case, judges in Saudi Arabia must "first and last . . . navigate within the boundaries" of the Hanbali school's authoritative works, which are the scholarly treatises primarily consulted by Saudi judges.[74] Using these scholarly writings as guides, Saudi judges identify a "spectrum of possibilities on any given question, rather than a single 'correct' answer."

Thus, in this highly different legal environment, the predominate factor in determining the Saudi law on a given issue is the study and analysis, or *ijtihad*, that a judge brings to bear in each particular case. To state it in different terms, the critical inquiry is whether "the proper analytical procedures are followed in reaching the results." The trial judge so recognized, observing that "[w]hen faced with the daunting task of determining the elements of *ghasb* and the damages available for this tort, the Court, weighing the credibility of each Saudi law expert, exercised, as best it could under the circumstances, *ijtihad*, to reach the 'right' result."[75]

Mindful of how "daunting" would be the task of determining the Saudi law principles applicable to this case, the trial judge made exceptional efforts to ensure that she was fully informed of the Hanbali teachings upon which to ground her legal rulings. Before trial, the parties presented the trial judge with seven reports from four Saudi law experts (two expert witnesses for each side), as well as each expert's lengthy deposition. Perceiving a conflict in the experts' opinions, the trial judge retained an independent expert,

---

**73.** *Saudi Basic Indus. Corp.*, 2003 WL 22016843 (Del.Super.Aug.26, 2003) at *1 (italics in original, internal footnotes omitted).

**74.** Particularly important are two works by Mansur al-Bahuti, a 17th century scholar, as well as the works of Ibn Qudama and Al Maqdisi.

**75.** *Saudi Basic Indus. Corp.*, 2003 WL 22016843 at *2, n. 8 (Del.Super.Aug.26, 2003) (citing the testimony of Professor Hallaq that every time a Muslim judge exercises *ijtihad*, "it is basically his best . . . effort to find what is the right thing to do . . ." and the testimony of Herbert S. Wolfson, that a Saudi judge performing *ijtihad* tries to do the "right thing.").

Mr. Herbert S. Wolfson, and obtained his advice on critical issues, including the elements of, and the damage remedies available for, usurpation. Mr. Wolfson prepared an initial report and the trial court permitted him to conduct additional research in Saudi Arabia, after which Wolfson prepared a supplemental report and was deposed for a full day. After reviewing a total of nine reports and over one thousand pages of deposition testimony, the trial judge then held a day-long pretrial hearing, to permit the parties to present live testimony from Professor Hallaq, Dr. Vogel and Mr. Wolfson. Only after this extensive process did the trial court undertake to determine the disputed elements of *ghasb*. Even after that comprehensive inquiry, the court considered (over ExxonMobil's objection) two additional reports of Dr. Vogel submitted *post-trial.*

It is notable that only after SABIC received the adverse jury verdict did it attack the trial court's *ijtihad* process, even going so far as to contend, in a post-trial affidavit of Dr. Vogel, that the trial judge "was simply not qualified to practice *ijtihad.*" SABIC advances that same position on appeal. Confronting that contention, the trial judge made the following observations which, in our view, afford a complete answer to SABIC's position:

> What troubles the Court even more is that Dr. Vogel opines that this Court cannot credibly engage in the *ijtihad* process. According to Dr. Vogel, "*ijtihad* requires for its credibility qualifications which on the very face of things, neither Prof. Hallaq, myself or, with respect, any U.S. Court possesses." If Dr. Vogel is correct, then why did SABIC choose to file this dispute in a United States Court? If Dr. Vogel is correct in that neither he nor Dr. Hallaq possess the qualifications to engage in the *ijtihad* process, then *what* Saudi law "expert" would be able to assist this United States Court in determining the applicable Saudi law?

\* \* \* \* \* \*

It is remarkable that SABIC, having [purposefully] selected this forum instead of a Saudi Court, knowing the United States legal system is dramatically different than the Saudi legal system, comes forward after a verdict against it to claim that *no* American judge is qualified to interpret and apply Saudi law. This is particularly incredible in light of SABIC's vehement argument that this case should be tried by a U.S. judge.[76]

As we view it, the careful, painstaking inquiry that the trial judge conducted puts to rest SABIC's contention that she engaged in a standardless, "seat of the pants" determination of the disputed Saudi law issues. It is one thing for SABIC to argue that one or more specific decisions resulting from the trial judge's inquiry are legally erroneous. On this record, however, it is not fair for SABIC to contend that the trial court's analytical process itself was arbitrary, unprincipled or lawless.

We turn next to the specific legal errors that SABIC claims the trial judge made in her *ghasb* liability and damages determinations and jury instructions.

(b) *The Claim That The Trial Court Determined The Legal Elements of Ghasb Erroneously*

After considering the extensive documentary and testimonial evidence of Islam-

---

**76.** *Saudi Basic Indus. Corp.,* 2003 WL 22016864 at \*4 (Del.Super.Aug.26, 2003)

(italics in original, internal footnotes omitted).

ic law pertaining to *ghasb*, the trial court determined that:

> In order to establish a claim for usurpation, Mobil or Exxon must show, by a preponderance of the evidence, that SABIC wrongfully exercised ownership or possessory rights over the property of another without consent, which means with blatant or reckless disregard for those property rights. The conduct need not be intentional.[77]

■ SABIC does not dispute that ExxonMobil factually established each of those elements. Rather, SABIC argues on appeal, as it did in the Superior Court, that the trial court's formulation of the tort of usurpation is erroneous because *ghasb* includes two additional elements that the trial court ignored: (1) SABIC's taking of the joint ventures' property must be "open and obvious," and (2) the taking must be "intentional and without any color of right." Thus, SABIC argues that it cannot be adjudicated as a usurper so long as its seizure of its partners' property was surreptitious, as distinguished from being open and obvious.

The trial judge rejected this argument on the ground that SABIC's two additional proffered elements find no support in the Hanbali works, as explicated by the Saudi law experts whose testimony she found to be credible. Having reviewed the extensive record developed on this issue, we conclude that the trial judge's legal rulings, and the intermediate evidentiary and factual rulings upon which they are grounded, are correct.

Bearing importantly on this issue, as the trial judge found, is that "[as] Mr. Wolfson opined...there is no single binding defini-

tion of *ghasb*, 'but rather a range of possibilities.' " Dr. Vogel testified that...there is "no single 'binding definition of usurpation [or *ghasb* ].' "[78] Not surprisingly, all three experts "differed on the proper elements of a *ghasb* claim."[79] That being the case, the trial judge had no alternative but to decide which expert's testimony to accept or reject. The trial court determined to accept the opinion testimony of Professor Hallaq and Mr. Wolfson, and to reject that of Dr. Vogel. The court found:

> ExxonMobil points out that Dr. Vogel's "varying and inconsistent" definitions of *ghasb* only confirm that there is no one correct definition. The Court is inclined to agree. Each time he opined on the subject, Dr. Vogel's definition [of] *ghasb* seemed to change....
>
> The Court does not find Dr. Vogel's latest definition of *ghasb* persuasive. Having had the opportunity to watch Dr. Vogel testify, observe his demeanor on the witness stand when his interpretation of Saudi law was challenged, and review his latest affidavit as well as his prior affidavits and deposition testimony, the Court finds he has become (or been exposed as) more of an advocate than an objective scholar of Islamic law. His relentless attacks on Dr. Hallaq's qualifications and expertise further undermine his credibility in the Court's eye. The Court is concerned about Dr. Vogel's objectivity.[80]

That finding is entitled to deference on appeal. Based upon the testimony of Mr. Wolfson (and even, to some extent, of Dr. Vogel), the trial court determined that SABIC's first disputed element—an "open and obvious" taking—cannot be located in

77. *Id. at* \*1.

78. *Saudi Basic Indus. Corp.,* 2003 WL 22016864 at \*4 (Del.Super.Aug.26, 2003) (internal footnotes omitted).

79. *Id.* at \*3.

80. *Id.* at \*4 (footnotes omitted).

the works of the Hanbali school. As Mr. Wolfson noted, "the most influential Hanbali scholars, whose works enjoy tremendous respect in Saudi Arabia," do not "include openness or notoriety as elements in the definition of *ghasb*." Dr. Vogel also agreed that the Hanbali scholars do not include open and notorious in their definition of usurpation, and he conceded that even if the victim is completely unaware that a taking has occurred, the taking qualifies as usurpation:

> Q. Now suppose, just suppose, I have a bunch of horses, okay? . . . . And you come into my corral and take one of my horses, but I'm in Brazil. . . . So I have no idea that you have in fact taken my horses. . . . And, indeed, when I come back, I don't know that the horse is gone? . . . . That would be usurpation, too, wouldn't it?
>
> A. Yes.[81]

In short, the record supports the trial judge's foreign law determination that the Hanbali sources do not require that the wrongful exercise of ownership or possessory rights over the property of another must be "open and obvious." Nor do the Hanbali texts support SABIC's second argued-for element, that the taking must be "intentional." SABIC bases that argument upon the (rejected) testimony of Dr. Vogel, who never identified any Hanbali source that supports a definition of usurpation which includes an element of intentional transgression. Mr. Wolfson, whose testimony the trial judge did accept in some important respects, opined that "the intent to infringe cannot possibly be a necessary element" of a civil claim for usurpation, based on numerous examples of usurpation in the authoritative texts that demonstrate that even an innocent purchaser of wrongfully taken property can be held liable. Although the usurper must "inten[d] to exercise ownership, he need not inten[d] to infringe the rights of the true owner." The trial judge's determination of Saudi law, based entirely on expert testimony, is entitled to deference, as no basis has been shown to overturn it.

Accordingly, we find that the trial court committed no error in submitting the usurpation claim to the jury or in denying SABIC's motion for judgment as a matter of law.

(c) *The Claim That The Trial Court Instructed The Jury Erroneously On The Elements of Ghasb*

SABIC next argues that even if the trial court was correct in denying its motion for judgment as a matter of law, the court erred by not granting SABIC's alternative motion for a new trial. The basis for this argument is that the jury was not, but should have been, told that to find that SABIC committed usurpation, it must find that SABIC's conduct was "open, obvious, intentional, and without color of right." We have rejected that argument as the basis for SABIC's claim of entitlement to judgment as a matter of law. The argument fares no better when it is recast as a claim of entitlement to a new trial. Because we have upheld the trial court's determination that to constitute usurpation a wrongdoer's conduct need not be open, obvious, or intentional, it follows that the trial court committed no error in refusing to instruct the jury on definitional components that were not elements of that tort under Saudi law.[82]

---

**81.** Professor Hallaq explained that "[t]he victim doesn't have to know that he was violated in order to be considered a victim of usurpation."

**82.** The trial court instructed the jury "that the tort of *ghasb* is comprised of the following elements: (a) the exercise of ownership or possessory rights, (b) over the property of

(d) *The Claim That The Trial Court Erroneously Permitted The Jury To Decide Whether To Award "Enhanced Damages" To ExxonMobil*

SABIC next contends that the trial court erred by denying its motion for judgment as a matter of law as to the portion of the jury verdict that awarded "enhanced damages" to ExxonMobil.[83] The ground for this claim is that "no Saudi court would award enhanced damages in a contract case such as this one," because "enhanced damages are unprecedented in contract cases, even where the elements of *ghasb* are otherwise present."

SABIC presented that same argument to the trial judge, who concluded that "SABIC's argument that damages for *ghasb* are rarely awarded in the Saudi legal system and are virtually unprecedented[,] is unsubstantiated, unverifiable and irrelevant...."[84] As the trial court explained:

[S]imply because SABIC's expert is unable to name a case in which a Saudi judge awarded damages for usurpation is of little import to this Court considering that Saudi law does not recognize *stare decisis* and Saudi law opinions are not published. To say that usurpation damages are "highly unusual" presumes that there are Saudi law cases where judges refuse to award damages for usurpation even when the elements have been clearly established. No such case law was provided to the Court, nor could it be, given the nuances of the Saudi law system. Moreover, whether a form of

damages is "unprecedented" is also irrelevant if such damages are available according to the authoritative Hanbali texts which are the primary works consulted by Saudi judges to determine the law applicable to the type of dispute raised in this case.[85]

SABIC makes no effort to confront the trial judge's reasoning in its briefs. Instead SABIC strives to create the impression that all the Saudi law experts, including Mr. Wolfson, agreed that a Saudi judge would be unlikely to award so-called "enhanced damages" in a contract action. That argument, besides being legally irrelevant, is factually wrong. A claim for *ghasb* lies in tort, not in contract. Mr. Wolfson testified that compensatory damages for the tort of *ghasb*, which includes repayment of both the actual overcharged amounts and the actual past profits obtained by SABIC's use of those amounts in its business operations, finds solid support in the Hanbali treatises. Even Dr. Vogel acknowledged that "the Hanbalis have made a point of...trying to pursue that usurper for all conceivable profits."[86] Accordingly, no basis has been shown for SABIC's claim that the trial court committed legal error by submitting the "enhanced damages" issue to the jury.

(e) *The Claim That The Trial Court Instructed The Jury Erroneously On The Question of Enhanced Damages*

SABIC's final argument is that it is entitled to a new trial on enhanced dam-

---

another, (c) without consent, (d) wrongfully." *Saudi Basic Indus. Corp.*, 2003 WL 22016864 at *1 (Del.Super.Aug.26, 2003).

**83.** As previously noted, "enhanced damages" refers to $324 million of the total $416.8 damages award, which represents the profits realized by SABIC for using the overcharged amounts in its business.

**84.** *Saudi Basic Indus. Corp.*, 2003 WL 22016843 at *3 (Del.Super.Aug.26, 2003).

**85.** *Id.* at *2. The trial judge further observed "[b]y way of analogy [that] under U.S. law, punitive damages are rarely awarded, yet we do not instruct the jury about the frequency or lack of frequency of such awards." *Id.*

**86.** *Id.* at 0066.

ages, because the trial judge instructed the jury that it "may" award enhanced damages for *ghasb,* yet provided no guidance to cabin the jury's discretion in awarding such damages. That "total lack of guidance," SABIC urges, was not only "prejudicial and reversible error," but also a denial of due process of law, because the instruction granted "unfettered...discretion...without any consideration by the jury of the factors that would be taken into account by a Saudi Court."

 Implicit in SABIC's position, but never straightforwardly argued to us or to the trial court, is the premise that this case should never have been tried to, or decided by, a jury. We address that implicit premise first. Had SABIC taken this position frontally and from the outset of the case, that argument might have considerable force. The reason is that in an American jury trial, the division of labor between judges and juries does not readily lend itself to the *ijtihad* methodology that Saudi Arabian jurists are required to employ. A jurist deciding a case under Saudi law would have wide discretion that, as the Superior Court found, differs significantly from that which is normally vested in an American jury. A Saudi jurist is empowered—although not legally required—to consider all equities that might bear on what, if any, damages the Saudi jurist, unconstrained by American rules of evidence,[87] might choose to award.[88]

To put it in different terms, had SABIC brought this case in Saudi Arabia, the litigation would have been not unlike a proceeding in equity before a jurist having capacious authority to make factual and legal determinations, including shaping a remedy in accordance with the jurist's sense of equity, circumscribed and influenced by the traditions of Islamic law that he would bring to bear on the dispute. In such a proceeding, the Saudi jurist would have had complete discretion to conclude that an award requiring SABIC to disgorge the profits it earned from the wrongfully retained overcharges was equitable. Unlike the division of labor inherent in an American jury trial, the Saudi jurist's application of *ijtihad,* and his resulting remedial decision, would not neatly divide between determinations of law and fact.

But, this case was not brought in Saudi Arabia. Instead, SABIC voluntarily brought this case in an American court of law, where SABIC knew there is a division of labor between the judge (whose duty is to determine the applicable law) and the jury (whose duty is to determine the facts). Nor did SABIC ever seek to avoid a jury trial at the outset of the case, which it could have done. Instead, SABIC waited until only a few weeks before the trial to file a motion to strike ExxonMobil's jury trial demand. Even then, the basis for SABIC's motion was not that a jury was inherently incapable of deciding Saudi law claims, but rather that the war in Iraq and the other events unfolding in the Middle East would prejudice the jury against SABIC. The trial judge denied that motion and SABIC's post-verdict motion for a new

---

**87.** For example, the Saudi jurist would not be constrained by D.R.E. 403, under which the trial judge in this case excluded evidence because its probative value was outweighed by its potential for prejudice.

**88.** By way of example, as Mr. Wolfson testified, a Saudi adjudicator could (but would not be required to) take into account factors such as: (i) whether SABIC's conduct was intentionally harmful; (ii) whether, even if tortious, SABIC's conduct was not intended to deprive Yanpet or Kemya of their property; and (iii) whether any obligation SABIC had to restore any wrongful overcharges should be mitigated by the length of time ExxonMobil took to assert their claims.

trial (arguing the same ground). The trial court ruled that ExxonMobil was constitutionally entitled to have a jury decide its counterclaims. Moreover, the court had taken extraordinary precautions to identify, and to afford SABIC an opportunity to strike, any potentially prejudiced jurors.[89] SABIC has not challenged that ruling on appeal.

Having chosen an American forum whose adjudicatory processes SABIC knew were different from those of Saudi Arabia, SABIC cannot fault the trial court for having followed those procedures. That is especially true where, as here, SABIC presented the trial judge very little by way of helpful proposed instructions, and where the instructions it did propose were reasonably found to be not well grounded in Saudi law. Having rationally taken into account the unusual (from a Saudi law standpoint) procedural posture in which she was functioning, and having grounded her instructions to the jury upon a well-reasoned distillation of the Saudi principles articulated by the foreign law expert whose testimony she was entitled to credit, the trial judge did all that could have fairly been expected.

■ Turning to the specifics of SABIC's claim, our review of a challenged jury instruction focuses " 'not on whether any special words were used, but whether the instruction correctly stated the law and enabled the jury to perform its duty.' " Jury instructions "need not be perfect," but they "must give a correct statement of the substance of the law and must be 'reasonably informative and not misleading.' "[90] We conclude that the instruction given to the jury as to awardable *ghasb* damages satisfies those standards. The jury was instructed as follows:

I will now explain to you an additional element of damages that you may award only if you find that SABIC is liable for usurpation, a claim I defined for you earlier.

If you find in favor of Exxon or Mobil on the claims for usurpation, then you may award damages above the amount, if any, you awarded for breach of contract based upon any profits you may determine SABIC derived by using in its operation the money, if any, that was usurped from YANPET or KEMYA. Damages for usurpation may not include any interest.[91]

■ Any appellate determination of whether a jury was afforded sufficient guidance in exercising its fact-finding discretion on a given issue, must necessarily depend upon the law that governs that issue and the instruction that the trial court gave (or refused to give) on that subject. In this case, the only specific request SABIC made to the trial court to furnish such guidance, was that the court instruct the jury on six factors that Mr. Wolfson suggested might possibly enter into a Saudi judge's perception of the equities in this case.[92] The trial judge declined

**89.** *Saudi Basic Indus. Corp.*, 2003 WL 22048238 (Del.Super.) at *1–*2.

**90.** *Corbitt v. Tatagari*, 804 A.2d 1057, 1062 (Del.2002) (quoting *Cabrera v. State*, 747 A.2d 543, 545 (Del.2000)).

**91.** *Saudi Basic Indus. Corp.*, 2003 WL 22016843 at *2 (Del.Super.Aug.26, 2003).

**92.** Those factors include: "(1) the court's perceptions as to the relative culpability of each party; (2) the lapse of time between the start of the alleged wrongful conduct and ExxonMobil's decision to file suit; (3) a desire to find the middle ground between competing litigants; (4) the sheer size of ExxonMobil's claim in terms of the absolute number of dollars at stake (and the attendant perception that awarding compensation above the principal amount might be 'too much'); (5) a desire to balance ExxonMobil's right to recover any wrongfully taken principal amounts with the

to give the requested instruction, for two reasons. The first was that the requested instruction did not represent established Saudi law; the second was that to give the requested instruction would likely confuse and mislead the jury. The trial court's analysis of these concerns, as reflected in her post-trial denial of SABIC's motion for judgment as a matter of law or, alternatively, a new trial on the damages issue, is thoroughly textured, well-reasoned, and, in our view, dispositive of SABIC's claim of error.

The trial judge's first reason for not instructing the jury on the six "Wolfson factors" was that they did not represent established Saudi law:

It is important to place the six factors articulated by Mr. Wolfson in the proper context. It is clear from the context in which Mr. Wolfson offered this testimony that he was not stating that these factors were Saudi law, that the factors were exclusive, or that consideration of these factors was required. To the contrary, these factors, according to Mr. Wolfson[,] are non-exclusive considerations that "*might possibly* enter into a Saudi judge's perception of the equities" in this case. Mr. Wolfson clearly opined that "[a] Saudi Arabian judge enjoys considerable discretion to rule in a manner leading to what he perceives as a fair and just result." .... The Court did not find during the Saudi law hearing, nor does it find now, that Mr. Wolfson's list of factors reflects established Saudi law...based upon the authoritative texts.... The Court noted during the Saudi law hearing that Professor Hallaq and Dr. Vogel did not identify

any such list of factors and there was no evidence to suggest that such a list of factors had ever been embraced by the Hanbali school. Nowhere in Dr. Vogel's pretrial affidavits or in his post-trial affidavits does he provide the Court with authority in the Hanbali texts or otherwise to support a jury instruction on these...factors.... [A]nd while the Court certainly considered Mr. Wolfson's list of factors in the context [in which] they were presented...the Court believed then, as it does now, that it would be error to instruct the jury on these factors. The Court did not want to supply to the jury an incomplete list of factors or suggest factors that, under Saudi law, are not "factors" embraced by the Hanbali school.[93]

The trial judge's second reason was that to instruct on those factors would confuse and mislead the jury:

Moreover, the Court did not believe that the jury would be able to meaningfully engage in an analysis of each of the factors without creating tremendous confusion and uncertainty. This situation is a good example of the difficulty in applying Saudi law in a *jury* trial. A Saudi judge exercises tremendous discretion and is not bound by precedent. A Saudi judge is free to consider whatever evidence he feels is worth considering and disposing of any evidence he does not consider worthwhile. In other words, under the Saudi legal system, *Delaware Rule of Evidence 403* has no place. Here, the Court exercised its discretion in determining not only what the Saudi law is, but how it should be

possibility of undue hardship to SABIC and/or (6) a concern that ExxonMobil's decision to invoke the Islamic law tort of *ghasb* may have been motivated by a desire to sidestep the unavailability of interest or lost profits in Saudi Arabia and, thus, should not be rewarded."

*Saudi Basic Indus. Corp.*, 2003 WL 22016843 at *2 (Del.Super.Aug.26, 2003).

93. *Id.* at *2 (italics in original, internal footnotes omitted).

explained to the jury. Obviously, many of the concepts of Saudi Arabian law are not easily understandable to a U.S. judge, much less a lay person in the United States. The Court in this case attempted to set forth the elements of the tort and convey to the jury in a clear, understandable manner the circumstances under which *ghasb* damages would be awardable. The Court could not present to the jury every conceivable circumstance under which *ghasb* damages could be awarded, nor could it tell the jury . . . that it is "rare" for juries to award damages for *ghasb* . . . . The factors Mr. Wolfson suggested are factors that a judge *could* analyze. The factors invite considerations that an American jury would not be permitted to consider, such as "a desire to find the middle ground between competing litigants," in other words, a compromise verdict or a consideration of the consequences of the jury verdict. Factor 5 may have prompted the jury to balance ExxonMobil's right to recover any wrongfully taken principal amounts against the *possibility* of undue hardship to SABIC. Such an instruction would invite inappropriate considerations by the jury having no place in deliberations and encourage the jury to engage in endless speculation about the "possible" undue hardship that SABIC might experience if ordered to pay damages. In addition, the Court was concerned that Factor 2 impermissibly injected into the case the issue of statute of limitations which the Court had ruled pretrial was contrary to Saudi law. To suggest to the jury that ExxonMobil's delay could be considered . . . when deciding whether or not to award damages for usurpation

flies in the face of the Saudi substantive law which provides that property rights are eternal and cannot be extinguished by the passage of time.[94]

On appeal, SABIC argues that even if the trial court correctly refused to grant judgment to SABIC as a matter of law, the court should nonetheless have granted SABIC a new trial, because the jury was given no guidance on how to properly exercise its otherwise unfettered discretion. Given the difficult circumstances that confronted the trial judge, we cannot conclude that her jury instructions relating to *ghasb,* however succinct, subjected SABIC to any injustice that warrants reversal.

The jury was not given unbridled authority to do whatever it wished. The trial judge plainly instructed the jurors that they could not find for ExxonMobil unless "SABIC wrongfully exercised ownership or possessory rights over [their] property . . . without consent, which means with blatant or reckless disregard for those property rights." That is, the jury was told that SABIC's state of mind and conduct must have been far more culpable than an inadvertent breach of contract.[95] The jury was also instructed that they could, *but need not,* award additional damages beyond damages for breach of contract if they concluded that SABIC had committed *ghasb.* And, if, in that event, the jury made a discretionary decision to award additional damages, the trial judge cabined that discretion by limiting any additional award to "any profits you may determine SABIC derived by using in its operations the money, if any, that was usurped . . ." These instructions flowed from the trial judge's legal determination, based upon Saudi law principles well

94. *Id.* (italics in original, internal footnotes omitted).

95. The jury was told that, at a bare minimum, it must find that SABIC acted with "reckless disregard" for ExxonMobil's rights.

grounded in the expert testimony that she accepted, that if the jury found that SABIC committed *ghasb* as she defined it, an award of damages so limited would do justice.

If the trial judge, based upon the identical record, had reached the same result in a bench trial as the jury did in this trial, SABIC would have had no ground to attack that result as contrary to law or equity. By parity of reasoning, the verdict reached by the jury here—a product of the combined effort of the jurors and of the trial judge who circumscribed the jury's discretion in accordance with her application of *ijtihad*—affords SABIC no independent basis for reversal.[96] To the extent SABIC suggests that the result would have been different had the case been litigated in Saudi Arabia, that argument, even if true, has no greater merit than would the argument that a jury verdict should be set aside because another jury would have decided the case differently, or that an equitable decree should be set aside because another chancellor might have crafted a different remedy. Arguments of that kind have never, for good and obvious reason, found favor under our law, and they find no favor here.

## CONCLUSION

For the foregoing reasons, the judgment of the Superior Court awarding damages to ExxonMobil, and against SABIC, is affirmed. The mandate shall issue forthwith.

---

**96.** Even if the trial judge's instructions were regarded as giving the jury an implicitly binary choice regarding damages—*i.e.*, to award damages as she formulated them or to award no additional damages beyond damages for breach of contract—that binary choice worked no fundamental unfairness upon SABIC. For a jury to find that a party that recklessly disregarded the property rights of another should be required to disgorge all profits it wrongly obtained, is hardly alien to our tradition. Nor would be an order requiring full disgorgement by a party committing tortious conduct inconsistent with Saudi law. In large measure, SABIC's argument reduces to a contention that the trial judge erred by not instructing the jury that it could, based on some generalized sense of equity, award partial, rather than full, disgorgement, once it found that additional damages for *ghasb* were warranted.